UNITED STATES of America, Appellee,

v.

James McGRATH, Sylvester Scigowski, Scott Cooper and Bruce Buckle, Appellants.

Nos. 1181 to 1184, Dockets 79–1103, 79–1105, 79–1111 and 79–1116.

United States Court of Appeals, Second Circuit.

Argued June 14, 1979.

Decided Dec. 10, 1979.

See also D.C., 459 F.Supp. 1258.

Paul Casteleiro, New York City (Michael Kennedy, New York City, on the brief), for appellant McGrath.

Mark Lemle Amsterdam, New York City, for appellant Scigowski.

Stanley L. Siegel, New York City (Norman T. Corenthal, New York City, on the brief), for appellant Cooper.

Richard W. Levitt, New York City (Gerald B. Lefcourt, New York City, on the brief), for appellant Buckle.

Kenneth V. Handal, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., and David C. Patterson, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before MANSFIELD, MULLIGAN and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

After a four week jury trial in the Southern District of New York, Henry F. Werker, District Judge, appellants Scigowski, McGrath, Cooper and Buckle were convicted of conspiring to possess and to distribute large quantities of marijuana during the four year period between June 8, 1974 and June 15, 1978. The latter three appellants also were convicted of substantive offenses of possession with intent to distribute marijuana.

Of the numerous claims of error raised on appeal, we find the following to be the only ones which warrant attention in this opinion:

(1) Whether the district court properly denied motions to suppress evidence seized without a warrant from a van and from a briefcase.

(2) Whether the indictment and trial were timely under the Speedy Trial Act.

(3) Whether the evidence was sufficient to establish a single conspiracy and to connect appellants thereto.

(4) Whether a notebook seized from a co-conspirator was properly admitted in evidence.

Other subordinate claims of error have been raised.

We have carefully considered all claims of error raised by all appellants and we find no merit in any of them.

We affirm.

I.

During the four year period from June 8, 1974 to June 15, 1978, McGrath was a large-scale marijuana supplier. With help from friends, including the other appellants, he engaged in a substantial sale and distribution operation. Cooper, together with co-conspirators Schaller and Felle, were distributors for McGrath. Scigowski was a distributee who resold the marijuana he received.

Prior to January 1978, most of the group's dealings in marijuana involved quantities ranging from 10 to 135 pounds. At one point Cooper's sales ran as high as 800 pounds. The group also engaged in some cocaine transactions.

In January 1978, McGrath received some four tons, or 8,000 pounds, of marijuana. On January 26, McGrath had sent Felle a shipment of 3,400 pounds of marijuana so that the ring could distribute from both the Schaller farmhouse in Kingston, New York, and from a New York City location. Felle called on Cooper and Scigowski for help in finding a place to store the 1.7 tons of contraband. Cooper came forward with a friend who agreed to store the marijuana in a rented warehouse. When McGrath and Buckle arrived with the shipment, it was taken first to a warehouse in Queens and then to another in Brooklyn. At the latter, after being sorted and logged, it was left in storage with a "distributing company" listed as bailor. Cooper and Felle distributed some of the warehouse marijuana on a consignment basis. Felle also delivered bales from Brooklyn directly to Cooper and Scigowski at their homes in the Soho section of New York City.

It was during one such delivery that law enforcement agents began to close in. On January 30, 1978, Drug Enforcement Administration (DEA) agents were watching as Felle delivered three bales of marijuana to Scigowski. After seeing Felle and Scigowski carry burlap bales from a car into the latter's house, the agents placed both men under arrest.

Felle quickly agreed to cooperate with the government. He informed the agents that he expected another very large marijuana shipment to arrive from Kingston the following day. Felle's telephone calls to other members of the ring in the early hours of the morning confirmed the fact of the shipment, but failed to pinpoint the details for the agents.

Some time after noon on January 31, Buckle arrived at Felle's New York City apartment, picked up Schaller, and departed for Kingston in a Chevrolet camper van owned by McGrath. Police units in the field learned of the make and license number of the van by radio at 1:30 p. m. DEA Agent Siegel, who had arrested Felle, spotted the van near Exit 16 on the Thomas E. Dewey Thruway at 3:45 p. m. He followed the van to a Volkswagen dealership in Kingston and then to the Schaller farmhouse where it arrived between 4:30 and 5:00 p. m. Between then and 6 p. m., a New York State police airplane conducted air surveillance of the farmhouse and reported to the ground units that the van was being loaded with marijuana.

The agents did not know whether the van would remain in Kingston overnight. They had Felle call Schaller to learn his plans. Felle relayed to the agents Schaller's assurance that the van would leave for New York City by 8 p. m. At 8:45 the van was still at the farmhouse. DEA Agent Siegel decided to apply for a search warrant. He left for a nearby State Police barracks to prepare an affidavit. Within minutes of his departure, however, the van started to leave the Schaller farmhouse. Officers who were still there stopped the van which was being driven by Buckle with Schaller as his passenger. A search revealed 760 pounds of baled and boxed marijuana in the van. Both men were arrested. A briefcase in the possession of Schaller also was seized and later searched; it contained the records of the ring's drug operations. The records included a meticulous listing of which bales had gone to which persons. It reflected the exact contraband contents of the van. Agents quickly obtained a warrant to search the Schaller home where they found

and seized another 3,400 pounds of marijuana.

Although two tons of marijuana had been seized, the members of the ring still at large had 3,400 pounds at the warehouse. At cut rates by which they intended to reduce their stockpile in February, they sold another quarter of a million dollars worth of the warehouse marijuana. The operations of the ring finally were brought to a halt on June 15 when a superseding indictment was returned which named as defendants the four appellants and others. The indictment charged all defendants with conspiracy and with various offenses of possession and distribution.

McGrath, Buckle and Schaller already had been charged with possession in a complaint filed February 1. A further grand jury investigation followed, based on the records of the ring which had been seized. On March 3, the government moved for a 60 day extension in which to indict because of the great quantity of documentary material to be reviewed. Judge Pierce heard arguments on the motion. He also conducted an in camera examination of the records. On March 6, he granted the extension under the Speedy Trial Act. McGrath and Buckle were indicted on May 5 and thereafter were named with the other appellants in the superseding indictment of June 15.

In March 1978, Buckle, McGrath and Schaller filed motions for the return of their property. They also moved for the suppression of the material seized from the van. Judge Lasker denied these motions on March 16. McGrath and Buckle, with others, renewed these motions in September before Judge Werker to whom the case had been assigned for trial. Evidentiary hearings were held. Judge Werker filed three written opinions. In the first, he rejected the contention that police had conducted an impermissible, warrantless search of the camper. In the second, he held that the drug record notebook had been taken from Schaller's briefcase during an improper search under *United States v. Chadwick*, 433 U. S. 1 (1977). The third opinion, in

response to the government's motion objecting to the standing of Buckle and McGrath to assert Fourth Amendment claims regarding the briefcase, held that the requisite standing was lacking and that the notebook should be admitted in evidence.

After a four week trial, the jury convicted appellants of the offenses stated above. From the judgments entered on the jury's verdict, these appeals have been taken.

## II.·

■ In the light of these facts and prior proceedings, we turn first to the question whether the district court properly denied motions to suppress evidence seized without a warrant from the van and from the briefcase. We hold that the motions were properly denied.

Appellants in essence argue that the officers knew of the planned marijuana shipment some seven hours in advance and still failed to obtain a search warrant. This resulted, so the argument goes, in a planned but warrantless search, in violation of the Fourth Amendment. We disagree.

As for the search of the van, it is true that the agents, knew its identity approximately seven hours before the search at the Schaller farmhouse on January 31. At 1:30 p. m. they learned of the make and license number of a van owned by McGrath which had left New York City and was headed for Kingston. They did not know at that time whether, or when, the van would be carrying contraband. There had been frequent changes among the co-conspirators in their plans for picking up and delivering the marijuana. The corroboration for Felle's story that marijuana would be picked up and delivered was sketchy at best. The surveillance of the van near an exit on the Thruway, at a Volkswagen dealership in Kingston, thence to the Schaller farmhouse, and there from a New York State police airplane was inconclusive, although indicative of a good law enforcement stake-out. We think it was only prudent for the agents to await the loading of the van and its imminent departure with the contraband before applying for a search warrant. It is unlikely that they could have obtained a warrant before then. A premature application for a warrant would have been unduly burdensome and would have jeopardized the stakeout. The good faith of the officers is indicated by the fact that both the federal agents and the police moved to obtain a search warrant at about the same time. As it turned out, the van started to leave the Schaller farmhouse within minutes of the departure by DEA Agent Siegel for a nearby State Police barracks to prepare an affidavit in support of a search warrant. Since the contraband by then had gained the mobility of an automobile, there was probable cause to justify an immediate warrantless stop and search, regardless of whether there had been time earlier to obtain a warrant. *Chambers v. Maroney*, 399 U.S. 42, 46–52 (1970); *Carroll v. United States*, 267 U.S. 132, 151–56 (1925).

We hold that the district court properly denied the motions to suppress the evidence seized without a warrant from the van. *United States v. McGrath*, 459 F.Supp. 1258, 1263–64 (S.D.N.Y.1978).

■ As for the search of the contents of the Schaller briefcase, the essential question is whether appellants Buckle and McGrath had standing to object to the search of the briefcase which belonged to Schaller and was in his possession at the time of the seizure. The district court held that these appellants had no standing. We agree.

At the time the briefcase was seized, the van was being driven by Buckle, with Schaller as his passenger. The briefcase, which was owned by Schaller, contained Schaller's personal papers. It was in Schaller's possession, i. e. on the floor of the van next to Schaller, when it was seized. Neither McGrath nor Buckle had any proprietary or possessory interest in the briefcase or its contents, and they claimed none. The closest interest McGrath could assert was that he was the owner of the van in which he was not present when the briefcase was seized. Buckle's only interest was that he was the driver of the van which he did not own.

In view of these undisputed facts, it should be unnecessary to go further in upholding the district court's conclusion that neither Buckle nor McGrath had standing to object to the search of Schaller's briefcase. We nevertheless have considered the claims of standing by Buckle and McGrath in the light of *Rakas v. Illinois*, 439 U.S. 128 (1978), and *United States v. Ochs*, 595 F.2d 1247 (2 Cir. 1979) (Friendly, J.). We have concluded that neither case supports these appellants' claims of standing. Since appellants lack standing, we need not consider the applicability of *Arkansas v. Sanders*, 442 U.S. 753 (1979).

### III.

Appellants, or some of them, claim that the indictment and the trial were not timely under the Speedy Trial Act of 1974. 18 U.S.C. §§ 3161–74 (1976).

At the outset, we note that appellants appear to have confused the sanctions provided in the Speedy Trial Act, which sanctions do not become effective until July 1, 1980, 18 U.S.C. § 3163(c), with those provided in the Prompt Disposition Rules. *Cf. United States v. Bubar*, 567 F.2d 192, 205–08 (2 Cir.), *cert. denied*, 434 U.S. 872 (1977). Construing appellants' claims as having been asserted under the Prompt Disposition Rules,[1] we find them to be without merit.

The claim of pre-indictment delay stems from the fact that appellants were indicted on May 5, 1978, which was within the 60 day extension granted by Judge Pierce on March 6, 1978 pursuant to 18 U.S.C. § 3161(h)(8)(A) and (B)(iii). Otherwise, since appellants were charged in a complaint filed with a magistrate on February 1, 1978, the indictment would have to have been returned on or before March 16, i. e. within 45 days of their arrest on January 31. 18 U.S.C. § 3161(f). The delay of which appellants complain amounts to 50 days.

■ We hold that Judge Pierce was amply justified in granting the 60 day exten-

sion. After hearing arguments on the government's motion for the extension and after an in camera inspection of the books and records involved, he made findings in support of his order, including the finding that "the ends of justice served by granting a 60-day continuance outweigh the best interest of the public and the defendant[s] in a speedy trial." 18 U.S.C. § 3161(h)(8)(A). This finding surely was warranted in view of the large volume of documents, the large quantities of marijuana seized and "the unusual complexity of the factual determination to be made by the grand jury." 18 U.S.C. § 3161(h)(8)(B)(iii).

■ As for the claim of trial delay, Scigowski argues that the 80 days within which the trial should have begun started to run on July 25, 1978 when he was arraigned. 18 U.S.C. § 3161(c) and (g). Rather than beginning 80 days thereafter, the trial actually got under way on November 27, or 45 days later than the statutory period prescribed. The short answer to Scigowski's claim is that, aside from several short excludable periods of delay which are irrelevant to the claim asserted, the delay of which he complains was due entirely to the interlocutory appeal which the government took from Judge Werker's initial order suppressing the contents of Schaller's briefcase. This delay was excludable under 18 U.S.C. § 3161(h)(1)(D), (h)(7) and (h)(8). The fact that Schaller, whose trial Judge Werker declined to sever from the others, later pleaded guilty on November 6 and the government thereupon withdrew its interlocutory appeal, does not render the critical period of delay nonexcludable.

When Scigowski was informed that the trial was scheduled for November 13, 1978, his counsel informed the court that Scigowski was outside the country and requested a trial date in early January 1979, stating that "defendant Scigowski waives his right to trial between the date of November 13, 1978 and the date to be fixed by the Court . . . in early January, 1979." The trial began on November 27, 1978.

1. Plan for Prompt Disposition of Criminal Cases for the Southern District of New York

(1976); Second Circuit Judicial Council Guidelines Under the Speedy Trial Act (1979).

We hold that appellants' claims that the indictment and the trial were not timely are wholly without merit.

## IV.

We turn next to the claims of appellants Cooper and Scigowski that the evidence established multiple conspiracies rather than the single conspiracy charged and the claims of Scigowski and Buckle that the evidence was not sufficient to connect them to the conspiracy.

■■ The single vs. multiple conspiracy claim can be disposed of summarily. It has become a boilerplate claim in so many narcotics conspiracy cases that there remains very little for us to add to what already has been said repeatedly. *E. g., United States v. Sperling*, 506 F.2d 1323, 1340–41 (2 Cir. 1974), *cert. denied*, 420 U.S. 962 (1975); *United States v. Sisca*, 503 F.2d 1337, 1345 (2 Cir.), *cert. denied*, 419 U.S. 1008 (1974), and authorities cited in both cases. The short of it here is that, while the operation of this conspiracy may have been casual, its membership shifting and its structure not strictly hierarchical, nevertheless clearly there was sufficient evidence to warrant treatment of the components "as one general business venture." *United States v. Tramunti*, 513 F.2d 1087, 1106 (2 Cir.), *cert. denied*, 423 U.S. 832 (1975). Moreover, no request to charge or objection to the charge as given was made in the trial court with respect to the single vs. multiple conspiracy matter. We have stated in the past that this is a question singularly well-suited to resolution by the jury. *United States v. Armedo-Sarmiento*, 545 F.2d 785, 790 (2 Cir. 1976), *cert. denied*, 430 U.S. 917 (1977).

■ Scigowski certainly was a part of the conspiracy in the instant case. He dealt with Felle on six occasions between 1975 and the end of 1977, in amounts of marijuana ranging from 35 to 110 pounds. This acquaintance with the ring's operations reached beyond Felle. It included dealing with Cooper and helping to find storage space for the massive January shipment. Scigowski's generalized claim of spillover prejudice is belied by the jury's ability to distinguish among the appellants. For example, it convicted Scigowski on the conspiracy count but was unable to reach a verdict as to him on the substantive counts.

■ Cooper makes a similar claim of spillover prejudice. We hold that it is likewise without merit. No one was busier with the work of the venture than Cooper. He dealt from 1974 to 1978 in quantities of up to 800 pounds of marijuana. He located a storage place for the massive January 26 shipment. He sold portions of that shipment to others. He helped keep the ring's records.

■ The claims of Scigowski and Buckle that the evidence was not sufficient to connect them to the conspiracy are utterly without merit. Nothing need be added to what we have said above with respect to Scigowski. As for Buckle, he contends that he was linked to the conspiracy by the single act of being the driver of the van when it was stopped. The evidence, however, showed knowledge on his part of the breadth and scope of the conspiracy. He arrived in a rented truck with 1.7 tons of marijuana which he then drove to a warehouse. He was present during an ensuing discussion of where to store the contents of the truck. He asked Felle to contact him if there was marijuana to be distributed on Long Island. There simply is no basis in the record for saying that Buckle engaged in only a single transaction from which he could not have inferred the scope of the conspiracy. *United States v. Agueci*, 310 F.2d 817, 836 (2 Cir. 1962), *cert. denied*, 372 U.S. 959 (1963).

We hold that there is no merit whatever in appellants' claims that the evidence established multiple conspiracies rather than the single conspiracy charged and in the claims of certain appellants that the evidence was not sufficient to connect them to the conspiracy.

## V.

Finally, this brings us to Buckle's claim that a notebook seized from Schaller's brief-

case was improperly admitted in evidence, particularly certain notations therein which referred to "Buz", meaning Buckle.

The notebook in question contained detailed records of various drug dealings. It included entries that certain bales were intended for "Buz". This flatly contradicted Buckle's claim of ignorance of the wider conspiracy.

Buckle argues that the entries should not have been admitted in evidence, first, because the government never established that they were written by Schaller; second, because the personal knowledge underlying the entries never was established; and third, that it was never shown why Schaller himself could not have testified as to Buckle's role. Moreover, Buckle urges the inherent unreliability of the entries and that Schaller's failure to take the stand denied him the right to confront a witness against him.

 The Federal Rules of Evidence recognize that evidence admitted itself may afford the basis for inferring that it rests upon first-hand knowledge. Fed.R.Evid. 602; Advisory Committee Note to Rule 803. It is not unreasonable to expect that one who keeps the records of a multi-million dollar business does so with care and precision. Moreover, the testimony of a handwriting expert bolstered the inference that the records were kept by Schaller. There was circumstantial evidence to the same effect.

As to why Schaller was not put on the stand, it appears that he was never subpoenaed, although he was available to the defense.

[11] With respect to the claim that the failure to put Schaller on the stand denied Buckle the right of confrontation—and leaving aside the failure of the defense to subpoena him—it may be appropriate to recall what we said in *United States v. Puco*, 476 F.2d 1099, 1107–08 (2 Cir.), *cert. denied*, 414 U.S. 844 (1973), that "[i]n most cases the determination that a declaration is in furtherance of the conspiracy . . . will decide whether sufficient indicia of re-

liability were present. While there may be exceptions, we do not think that they will be frequent." In *United States v. Wright*, 588 F.2d 31, 37–39 (2 Cir. 1978), Judge Smith had occasion to consider when such an exception might be justified. Relying on three criteria, he concluded that *Wright* was not an exception. The first two factors present in *Wright* clearly apply with equal force here: (1) there is little likelihood that Schaller relied on faulty recollection in making the entries, since he made them contemporaneously; and (2) he certainly had no motive for distorting the entries. The third factor, the presence of generally corroborative material from witnesses subject to cross-examination, also is applicable here, although to a lesser extent. The presence in the van with Buckle of the bales earmarked for "Buz" surely constituted corroboration.

We hold that the notebook seized from Schaller's briefcase was properly admitted in evidence.

We have carefully considered appellants' other claims of error and find that they are without merit and do not warrant attention in this opinion.

We affirm the convictions of all appellants on all counts upon which they were convicted. Appellants were convicted after a fair trial on the basis of overwhelming evidence of serious crimes committed over a period of four years, culminating in the attempt to distribute literally tons of marijuana. We order that the mandate issue forthwith.

Affirmed.