UNITED STATES of America,

v.

**Vamond ELMORE, Defendant.**

**CRIM. NO. 3:04–CR–35(JCH).**

United States District Court,
D. Connecticut.

Feb. 25, 2005.

Kevin J. O'Connor, Peter S. Jongbloed, Robert M. Spector, U.S. Attorney's Office, New Haven, CT, for Plaintiff.

Paul F. Thomas, Thomas P. Belsky, Federal Public Defender's Office, New Haven, CT, for Defendant.

## RULING ON MOTION TO SUPPRESS [DKT. NO. 15]

HALL, District Judge.

Pursuant to the Fourth Amendment to the United States Constitution and Rule 12 of the Federal Rules of Criminal Procedure, defendant Vamond Elmore has moved to suppress all firearms gathered as a result of two searches conducted by Norwalk police, first a search of his car on June 25, 2003 and then an apartment search on June 27, 2003. For the reasons

that follow, Elmore's motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

On or about June 22, 2003, a call came in to Detective Thomas Roncinske of the Norwalk Police Department from a woman claiming to be a close friend of Vamond Elmore. This confidential informant identified herself as "Dorothy" and provided Roncinske with her home and cellular phone numbers. Roncinske had never used the caller before as a confidential informant and testified that he had never spoken with her prior to that date. Transcript of Thomas Roncinske at 57.[1] The caller told Roncinske that Elmore was in possession of some weapons and expressed concern that Elmore might "do harm to somebody." Tr. Roncinske at 5.

Roncinske spoke with the caller approximately four times throughout the day. The caller eventually told Roncinske that her last name was Mazza, that she was Elmore's girlfriend, and that she had kicked him out of her house. Detective Roncinske used this information to obtain an address and birthdate for a "Dorothy Mazza" from the Department of Motor Vehicles. Detective Roncinske did not go to the address he obtained, *id.* at 32, did not meet with the caller face to face, *id.*, and apparently contacted her solely by calling the cell phone number she had given to him,[2] *see id.* at 33. Roncinske did question the caller in an attempt to verify her identity. Specifically, he asked her about an incident in which Elmore had been shot. The caller appeared to know both the possible motive for the shooting and the physical injuries Elmore sus-

tained. She claimed to have been the individual who nursed Elmore back to health.

The caller informed Roncinske that she had seen Elmore in possession of several firearms, including a .38 caliber Smith & Wesson revolver loaded with hollow-point bullets, a .22 caliber pistol, a .38 caliber revolver, a "riot pump shotgun," and an AK–47 assault rifle. She stated that Elmore kept the Smith & Wesson in his car, a black, 2–door Acura with tinted windows and new Connecticut license plates that had recently been switched over from temporary plates. The caller said she had observed the Smith & Wesson hidden under an altered piece of carpet on the passenger's side of Elmore's car.

The caller also told Roncinske that Elmore frequented the Carlton Court and Round Tree Motel areas of Norwalk. She told Roncinske that Elmore kept the other firearms with a woman named "Tanea" and also in the car of one Dwayne Sherman. The caller claimed that "Tanea" lived in Building 14 at 133 Monterey Place (Carlton Court), in the apartment directly above Dwayne Sherman and his wife. She also claimed that Sherman's BMW was parked outside Building 14. The caller claimed to have seen the guns at her residence, but had not observed them in Sherman's car or "Tanea's" apartment. She claimed to have obtained that information from Elmore.

Detective Roncinske testified that he took steps to corroborate the information he obtained from his confidential informant. He went to 133 Monterey Place and observed a BMW registered to Dwayne Sherman parked in front of Build-

---

1. Hereafter, transcripts of hearing testimony will consist of the abbreviation "Tr." followed by the witness's last name and the pertinent page number. Ex: "Tr. Roncinske at __."

2. Detective Roncinske testified that the confidential informant did not want to meet face to face because she was afraid of being seen working with the police. *See* Tr. Roncinske at 32.

ing 13.[3] He also discovered that Denita Sherman, Dwayne's wife, leased an apartment in Building 14. Roncinske found out that a woman named Myra Humphrey leased the apartment above the Shermans.[4] Finally, Roncinske ran the criminal history reports for Elmore and Sherman and discovered that they had been arrested together for an armed robbery.

Based on this information, Detective Roncinske drafted a memo informing his fellow officers that Roncinske had received information that Elmore was in possession of a handgun. The memo stated that Elmore drove a black, 2–door, 1992 Acura. It noted that the vehicle's last known registration was a temporary registration, but that Roncinske had information that the car now had regular Connecticut plates. The memo warned officers that the handgun "may be hidden on the passenger side under the carpet", and informed them that Elmore "frequents the Carleton Court area and The Round Tree Motel on Westport Ave." Supplemental Mem. Opp. Mot. to Suppress at Ex. 1.

Norwalk Police Sergeant Kenneth King received the memo just prior to starting his late-night shift on June 24, 2003. Some time between 11:30 p.m. on June 24 and midnight on June 25, Sergeant King and Officer Mark Suda, driving in separate cars, spotted a black two-door Acura with tinted windows passing them in the vicinity of Carlton Court. The officers, who knew Elmore from prior encounters, testified that they identified him by looking through the untinted front windshield of his car while passing at approximately 25–30 miles per hour. *See, e.g.,* Tr. King at 23; *see also* Tr. Suda at 15–16. Both officers testified that both of their cars and the Acura

had their headlights on when the cars passed each other. *See, e.g.,* Tr. King at 24; *see also* Tr. Suda at 15. The officers turned their cars around to follow the Acura and pulled it over soon thereafter.

Sergeant King approached the Acura on the driver's side, while Officer Suda approached on the passenger's side. King asked the driver to lower the window, produce his license and registration, turn off the engine, and step out of the car. The driver complied. The officers asked the woman in the passenger seat, identified by Officer Suda as Tanea Humphrey, to step out of the car and walk back toward the police vehicles. She complied. At this point, the testimony of eyewitnesses diverges.

Sergeant King testified that when he looked into the car, the carpeting on the front passenger's side appeared loose. Tr. King at 14. King testified that, while still examining the car from the outside, he observed the handle of what he thought was a gun "behind" and "underneath" the driver's side seat. *Id.* at 13–14. King stated that the seat was leaning back, so he had to move the seat forward in order to pick up the gun. *Id.* at 13. The gun retrieved was a .38 caliber Smith & Wesson. *Id.* at 14. Following retrieval of the gun, Officer Suda placed Elmore under arrest. *Id.* Following Elmore's arrest, the police took Tanea Humphrey to her residence at Carlton Court.

Officer Suda testified differently concerning King's search. Suda testified that King was inside the car when he began his search. Tr. Suda at 10. After searching inside the driver's side of the vehicle, King "poked his head out" and told Suda that he had found an "87", Norwalk police termi-

---

**3.** Detective Roncinske noted that Buildings 13 and 14 share a parking lot. Tr. Roncinske at 15.

**4.** Detective Roncinske did not yet know that Tanea Humphrey, Myra Humphrey's daughter, also lived in that apartment.

nology for a handgun. *Id.* at 11. Tanea Humphrey also testified that the police were inside the car when they searched it.[5]

Following Elmore's arrest, on June 26, 2003, Detective Roncinske applied for a state search warrant for Tanea Humphrey's apartment and Dwayne Sherman's car. Roncinske included the information he had received from the confidential informant, the information he had obtained from his own investigation, and the results of the traffic stop that lead to Elmore's arrest. A search warrant issued, and the Norwalk Police executed the warrant on June 27, 2003.

Upon entering Tanea Humphrey's apartment, the police read Humphrey a Miranda warning and asked her where the weapons were located. She informed police that the weapons were in two bags in her bedroom closet, and that Elmore had asked her to keep the bags for him. The bags contained an AK–47 assault rifle, a .22 caliber pistol, a shotgun, a 500 round box of .22 caliber ammunition, and a magazine for an AK–47 loaded with ammunition.

At the time of the search, Elmore was not present in the apartment. In fact, he did not live there at all. Elmore and Humphrey had been friends for 1–2 years. Elmore had never stayed overnight at her apartment, never stayed for dinner, did not have a key or unfettered access, and had only been there approximately seven to ten times, and only for about five minutes on each occasion. Elmore's main link to the apartment appears to be the fact that he left the bags with Humphrey.

The police also searched Dwayne Sherman's car. In it, they found a .38 caliber revolver, loose ammunition, and some crack cocaine. However, none of the contraband from Sherman's car is charged in this case.

## II. DISCUSSION

Elmore moves to suppress all of the evidence collected by the Norwalk Police as a result of the searches performed on his car and Tanea Humphrey's apartment. He argues that Sergeant King and Officer Suda did not have sufficient, reliable information to form a reasonable suspicion justifying a investigatory stop under *Terry v. Ohio. See generally* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Without reasonable suspicion, the stop would constitute an unreasonable search under the Fourth Amendment, and any evidence collected must be suppressed. *See, e.g., Florida v. J.L.,* 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). Additionally, Elmore argues that without the evidence gathered by the traffic stop, the police did not have a basis to establish probable cause to support a search warrant for Tanea Humphrey's apartment. *See* Supplemental Mem. Supp. Mot. to Suppress at 14–15. Elmore also argues that several aspects of Detective Roncinske's Affidavit contained misleading information, or lacked information the absence of which created a misleading impression for the issuing court. Without probable cause, Elmore argues, the search of Humphrey's apartment violated his Fourth Amendment rights.

The court will examine the two searches in sequence.

### A. *The Terry Stop*

Police may briefly detain a suspicious individual for questioning if they have a reasonable suspicion that the individual may be engaging in, or about to engage in, criminal activity, and frisk him if they have a reasonable suspicion that the individual may be armed and dangerous. *United*

---

**5.** In fact, Humphrey testified that two officers searched the car, one from each side.

*States v. Colon,* 250 F.3d 130, 134 (2d Cir.2001). Such a *Terry* stop can include a search of the passenger compartment of the individual's automobile "limited to those areas in which a weapon may be placed or hidden" if the officers "possess a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long,* 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. 1868). A court must examine the "totality of the circumstances", *Colon,* 250 F.3d at 134, when deciding whether the police officers at the scene had an "articulable and objectively reasonable belief" sufficient to justify a *Terry* stop, *McCardle v. Haddad,* 131 F.3d 43, 49 (2d Cir.1997) (quoting *Long,* 463 U.S. at 1051, 103 S.Ct. 3469). The officers "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"' ... [because] [t]he Fourth Amendment requires 'some minimal level of objective justification' for making the stop." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

■ The police may use information obtained from confidential informants, even anonymous tips, as a basis for reasonable suspicion as long there are "sufficient indicia of reliability" supporting the information or tip. *See Alabama v. White,* 496 U.S. 325, 328–331, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Informants that the police have used before, or ones known to the police, make a stronger case for reliability than anonymous tipsters. *Adams v. Williams,* 407 U.S. 143, 146–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). This is especially true when the information is provided in a face-to-face setting, as the infor-

mant runs a greater risk of being held accountable for his or her statements. *United States v. Salazar,* 945 F.2d 47, 50–51 (2d Cir.1991). An informant's belief that she can be tracked down and will be held accountable for her information is critical in determining the informant's reliability. *See Colon,* 250 F.3d at 133. If a telephone tipster does not believe she can be traced, her incentive to give truthful information is greatly reduced.

■ "[A]n anonymous tip alone seldom demonstrates [an] informant's basis of knowledge or veracity ...." *White,* 496 U.S. at 329, 110 S.Ct. 2412. Such a tip must be significantly corroborated. *See id.* "[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* at 330, 110 S.Ct. 2412. In fact, when addressing a suppression motion concerning a stop based on information from an anonymous tip, the Supreme Court in *White* found it important that "the anonymous tip contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to *future actions of third parties ordinarily not easily predicted.*" 496 U.S. at 332, 110 S.Ct. 2412 (quotation and citation omitted) (emphasis added). In particular, the Court noted that corroboration, such as finding a car described by a caller in the place the caller predicted, was an example of an "easily predicted" piece of information that "anyone" could have relayed to the police. *Id.* Importantly, all information and corroboration relevant to a finding of reasonable suspicion must be known to the police officers prior to the *Terry* stop. *J.L.,* 529 U.S. at 271, 120 S.Ct. 1375.

■ The government argues that, due to the doctrine of collective or imputed knowledge, Sergeant King and Officer

Suda had sufficiently reliable information to provide them with the reasonable suspicion necessary to pull Elmore's car over and conduct a *Terry* stop. *See* Supplemental Mem. Opp. Mot. to Suppress at 10; *see also Colon,* 250 F.3d at 135 (imputed or collective knowledge doctrine permits officers to conduct a *Terry* stop when information sufficient for reasonable suspicion is not known by the officers themselves, but is known to other law enforcement officials involved with the investigation). Under this doctrine, the officers on the scene of the *Terry* stop are credited with knowing the information obtained by Detective Roncinske because "in light of the complexity of modern police work, the [searching] officer cannot always be aware of every aspect of an investigation; sometimes his authority to [search] a suspect is based on facts known only to his superiors or associates." *Colon,* 250 F.3d at 135 (quotation marks and citation omitted). However, in order to conduct the stop, the information known to Roncinske, King, and Suda collectively must be enough to justify a *Terry* stop.

 The government argues that the confidential informant in the case at bar provided sufficient information over the phone to make her a sufficiently reliable source given Detective Roncinske's subsequent corroboration. *See* Supplemental Mem. Opp. Mot. to Suppress at 11–13. The caller gave Roncinske her cell phone number, a home phone number, a first name, and eventually a last name. The caller identified herself as Elmore's girlfriend and was able to provide details about an incident in which Elmore was shot. In particular, the caller was able to give details regarding Elmore's injuries and the alleged motive for the shooting.

Apart from questioning the caller regarding Elmore's shooting, Roncinske ran her name through the Department of Motor Vehicles to obtain an address and a date of birth. Roncinske did not go to that address to see if the caller really lived there. He also did not meet face-to-face with the caller to confirm her identity.[6] There is no evidence that he even called the home phone number given by the informant, using only her cell phone for their conversations. There is also no evidence that Roncinske confirmed that either the cell phone number or the home phone number in question belonged to the person the caller claimed to be.

Additionally, most of the information the government credits as proving the caller's identity, *i.e.* the details of Elmore's shooting, was public information. Elmore offered into evidence several articles found in local newspapers detailing the shooting and its effects on Elmore. *See* Def's Ex. 20. The articles included the date, time and location of the shooting, and stated that Elmore was shot in the right leg, shattering it, in the groin, and in the left arm. *See id.* The only information the caller appeared to know that was not found in the newspaper articles was the police's theory as to the motive for the shooting. However, as that case has never been officially solved, such information might say as much about the caller's knowledge of police information as it does about her identity or knowledge of Elmore.

 By itself, this is simply too thin a reed for the government to grasp. De-

---

6. The court notes that Detective Roncinske did not pursue an in-person meeting with the caller because of her fears about being seen with the police. While the safety concerns of confidential informants are an important consideration, something could have been arranged that would have allowed the police to confirm the caller's identity while maintaining her confidential status.

spite having the caller's "name" prior to the *Terry* stop, Roncinske did not really know with whom he was speaking. He had never used the caller as a confidential informant and had not even spoken with the caller on any prior occasion. He simply trusted that the caller was giving him truthful personal information. When you combine this with the caller's refusal to meet with police, it appears as though the caller did not want to be traceable. Unlike the anonymous caller in *Colon*, who gave information that made clear that she intended to be identifiable and believed that she could be held accountable for her information at a later date, *see* 250 F.3d at 133, this caller only gave a name and two telephone numbers, neither of which were verified.[7] As such, the court finds that the facts place the caller most appropriately in the category of anonymous informant.[8]

This, of course, does not end the court's examination or rule out the police's ability to use the anonymous caller's information to develop a reasonable suspicion. *See, e.g., White*, 496 U.S. at 331, 110 S.Ct. 2412. The court must still examine the officer's decision in light of the totality of the circumstances. *See id.* at 330–331, 110 S.Ct. 2412. Under *White*, an anonymous caller's information can form the basis of reasonable suspicion when the police are able to corroborate it sufficiently. *See id.* at 331, 110 S.Ct. 2412. Specifically, it is important that the police corroborate the anonymous informant's predictions concerning the future actions of the target of

the police investigation because this demonstrates that the informant has insider information. *See id.* at 332, 110 S.Ct. 2412. Mere "easily obtained facts", standing alone, however, will not do. *See id.*

The anonymous informant in *White* provided several pieces of information, some predictive and some not. The informant told police that a "Vanessa White would leave 235–C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would be in possession of about an ounce of cocaine inside a brown attache case." *Id.* at 327, 110 S.Ct. 2412. The police investigated and spotted a car matching the informant's description at the Lynwood Terrace Apartments, and observed a woman leaving Building 235 and getting into the car.[9] *Id.* The woman then drove the car on the most direct route towards Dobey's Motel prior to being stopped by police just short of it. *Id.* The Supreme Court ruled that, while some pieces of information were not predictive, such as finding the parked car where the informant said it would be, and some pieces of information were not fully corroborated, such as White coming out of Apartment 235–C or arriving at Dobey's Motel, the fact that the anonymous informant had so closely predicted White's *future movements* provided the police with sufficient evidence of the informant's reliability to form the basis of the necessary

---

7. Detective Roncinske did verify the cell phone number to the extent that he called the number several times and spoke with the confidential informant. However, such calls could be answered by anyone, anywhere in the United States that had cell phone service. This is not the kind of verification required to invoke an exception to the protections of the Fourth Amendment.

8. Of course, any information verifying the identity of the informant uncovered after the *Terry* stop cannot be considered in the reasonable suspicion determination. *See, e.g., J.L.*, 529 U.S. at 271, 120 S.Ct. 1375.

9. The Court later noted that it was satisfied from the evidence that the events took place at or near the time predicted by the anonymous informant. *See White*, 496 U.S. at 331, 110 S.Ct. 2412.

reasonable suspicion to justify a *Terry* stop. *Id.* at 332, 110 S.Ct. 2412. Even so, the Court noted that it was a "close case". *Id.*

According to the government, Roncinske did several things to corroborate the informant's information. He verified that Elmore's temporary tags had expired; he verified that a black BMW registered to Dwayne Sherman was parked approximately where the informant predicted at Carlton Court; he confirmed that a Denita Sherman, Dwayne Sherman's wife, lived in Building 14 at Carlton Court; and that one Myra Humphrey lived in the apartment above Sherman. *See* Supplemental Mem. Opp. Mot. to Suppress at 12–13. The government also asserts that Sergeant King and Officer Suda also corroborated part of the informant's testimony by observing Elmore driving a black Acura with tinted windows and new Connecticut plates in the Carlton Court area. *See id.* at 13. Even assuming all of this is factually accurate, it is insufficient for a finding of reasonable suspicion.

As the Supreme Court specifically noted in *White,* knowledge of someone's car and where it is located is "easily obtained" information that "[a]nyone could have 'predicted' because it was a condition presumably existing at the time of the call." 496 U.S. at 332, 110 S.Ct. 2412. The same can easily be said of knowledge of the mere location of a person's apartment. The information regarding the Carlton Court apartments becomes even less supportive of reliability when you consider that Detective Roncinske confirmed that a Myra Humphrey lived at the apartment above the Shermans, while the informant told Roncinske that Elmore kept his guns with someone named "Tanea". Events eventually proved that Myra Humphrey was Tanea Humphrey's mother, and that Tanea did live in that apartment, but this was unknown to Roncinske at the time of the stop and therefore plays no role in deciding whether police had reasonable suspicion to stop Elmore's car. *See, e.g., J.L.,* 529 U.S. at 271, 120 S.Ct. 1375.

The one piece of "predictive" information relayed by the anonymous informant was that Elmore frequented the Carlton Court and Round Tree Motel areas of Norwalk. The government argues that Sergeant King and Officer Suda corroborated this when they spotted Elmore in his car driving down the street near Carlton Court shortly before pulling him over. However, the informant did not give the police a specific time Elmore would be driving in that area, did not give them a specific place Elmore would be heading, and did not even give them the name of a specific road the defendant would be traveling. If the specific information of this type provided by the anonymous informant in *White* created a "close call", the court is bound to say that the "corroboration" in this case falls short. *See* 496 U.S. at 332, 110 S.Ct. 2412; *see also generally Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (addressing the necessary corroboration for anonymous informants in the probable cause setting).

Having reviewed the totality of the circumstances in this case, the court finds that the police did not have a reasonable suspicion of criminal activity when they pulled Elmore's car over, and therefore evidence obtained pursuant to that *Terry* stop and search, including all incriminating statements made after Elmore's arrest, will be suppressed. Defendant's motion with regards to this search is granted.

**B. *The Apartment Search***

The defendant argues that once the evidence obtained as a result of the illegal stop is suppressed, the information remaining in the application is both mislead-

ing and insufficient to sustain a finding of probable cause for the search warrant issued for Tanea Humphrey's apartment. Additionally, the defendant argues that, even if he does not have the requisite reasonable expectation of privacy to challenge the warrant authorizing the search of Tanea Humphrey's apartment, he has a reasonable expectation of privacy in the bags found within Humphrey's apartment, and he can challenge the warrant's validity on that basis. Therefore, the defendant argues, because he has standing to challenge the warrant, and because the warrant is deficient, the evidence and statements collected during that search must be suppressed as well.

While it may be true that the warrant is defective, Elmore must first show that he has standing [10] to challenge the warrant. In this situation, Elmore has standing to challenge the validity of the search warrant if the court finds that he has a reasonable expectation of privacy in either Tanea Humphrey's apartment, *see United States v. Osorio,* 949 F.2d 38, 40 (2d Cir.1991), or a reasonable expectation of privacy in the closed containers found in Humphrey's apartment, *see United States v. Perea,* 986 F.2d 633, 641–42 (2d Cir.1993) (noting that the holding in *United States v. McGrath,* 613 F.2d 361, 365–66 (2d Cir.1979) ruled that "only the [individual] who owned the briefcase had a protectable privacy interest in it."). The court will examine both possible bases.

### 1. Tanea Humphrey's Apartment

Elmore bears the burden of showing that his own Fourth Amendment

rights were violated by the search of Humphrey's apartment. *Osorio,* 949 F.2d at 40. "Fourth Amendment rights are personal rights which … cannot be vicariously asserted." *Rakas,* 439 U.S. at 133–134, 99 S.Ct. 421. Courts may only suppress evidence against a defendant when that evidence was gathered pursuant to a search or seizure that violated that defendant's Fourth Amendment rights. *See id.* at 134, 99 S.Ct. 421. In order to have standing to show that his rights were violated, Elmore must show that he had an expectation of privacy in Humphrey's apartment and that his expectation of privacy was reasonable. *Osorio,* 949 F.2d at 40. A defendant's subjective expectation of privacy is legitimate when it is one that society is prepared to accept as reasonable. *Minnesota v. Olson,* 495 U.S. 91, 95–96, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). "A defendant lacks 'standing' in the Fourth Amendment context when his contacts with the searched premises are so attenuated that no expectation of privacy he has in those premises could ever be considered reasonable." *Fields,* 113 F.3d at 320.

While the court should examine Elmore's property or possessory interest in Humphrey's apartment, the inquiry does not end there. *See id.* at 320. "Residence may give rise to an expectation of privacy … but an individual may also have a sufficient interest in a place other than his own home so that the Fourth Amendment protects him." *Id.* (omitting

---

**10.** The court recognizes that the Supreme Court long ago rejected the use of a "standing" doctrine in favor of an analysis under substantive Fourth Amendment law. *See Minnesota v. Carter,* 525 U.S. 83, 87–88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998); *Rakas v. Illinois,* 439 U.S. 128, 139–140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). However, the court finds the term "standing" useful when dis-

cussing Fourth Amendment issues under the appropriate "reasonable expectation of privacy" analysis. *See, e.g., United States v. Fields,* 113 F.3d 313, 320 (2d Cir.1997) (discussing the defendant's ability to assert his Fourth Amendment rights using "standing" terminology while recognizing the analysis is separate from traditional standing doctrine).

internal citations and quotations). Neither the fact that a defendant does not sleep at a residence overnight, nor the defendant's illegal activities in the residence, necessarily make his expectation of privacy in that residence unreasonable. *See id.* at 320–321.

■■■ Elmore claims that his expectation of privacy resembles that of the defendants in *Fields*. In *Fields,* the defendants, James Fields and Christopher Crawley, were arrested in a third party's residence having been observed by police bagging crack cocaine in the rear bedroom. *See* 113 F.3d at 318–319. While neither defendant lived in the apartment, Fields "paid $125 per week for the privilege of using the apartment, made use of it on 40 or 50 occasions, could bring guests and, with minor restrictions, could come and go as he pleased, even if [the resident] was not present." *Id.* at 320. Crawley did not have a key and did not pay rent, but visited the apartment solely as Field's guest and slept over on at least one occasion. *See id.* at 321. The Second Circuit held that Field's contacts with the apartment were sufficient to give him a legitimate expectation of privacy, *Id.* at 320, and that Crawley gained a similar expectation as Field's guest because "any guest, in appropriate circumstances, may have a legitimate expectation of privacy when he is there 'with the permission of his host, who is willing to share his house and his privacy with his guest.'" *Id.* at 321 (quoting *Olson,* 495 U.S. at 99, 110 S.Ct. 1684). The court noted that "[s]ociety generally recognizes the legitimacy of privacy expectations held by guests who, like Crawley, have been invited to the premises by their host for an extended visit." *Id.*

The government argues that Elmore's expectation of privacy does not meet the reasonableness standard propounded by *Fields,* and moreover, is more akin to the interests the Supreme Court discussed in *Carter.* The defendants in *Carter* were also observed by police bagging narcotics in a third party's residence, and arrested shortly thereafter. *See* 525 U.S. at 85–86, 119 S.Ct. 469. In that case, the defendants did not live at the residence in question, had never stayed overnight, had, in fact, never been to the residence prior to time of their arrest, had come there solely for the purpose of bagging narcotics, and were there for approximately two and a half hours. *See id.* at 86, 119 S.Ct. 469. The defendants did pay the third party in kind [11] for their use of the apartment for their narcotics activity. The majority held that individuals legitimately on the premises merely to engage in business activities, who have no prior connection to the premises or householder, and who are only present for a short period of time, do not have a reasonable expectation of privacy in those premises. *See id.* at 91, 119 S.Ct. 469.

Elmore's expectation of privacy with regards to Humphrey's apartment does not fit neatly into either category. Elmore did not have property or possessory rights to the apartment. Elmore visited the apartment with the tenant's permission between seven and ten times over a period of a year or two, did not have a key to the apartment, did not pay rent, did not take meals at the apartment, could not come and go as he pleased, and never stayed there overnight. Additionally, Ms. Humphrey testified that Elmore stayed for only about five minutes on the occasions he visited the apartment. However, Elmore did have

---

**11.** The Court noted that the third party received one-eighth of an ounce of cocaine for her trouble.

Humphrey's permission, at least tacitly, to store the contraband in her closet. Also, there is no evidence that Elmore entered the apartment solely to engage in any type of "commercial transaction" or business dealings.

Based on these facts, the court finds Elmore's connection to Humphrey's apartment to be too attenuated for his subjective expectation of privacy to be reasonable. *See, e.g., Fields*, 113 F.3d at 320. While Fields paid rent, spent large amounts of time at the residence in question in that case, and used it almost without restriction, Elmore's visits to Humphrey's apartment were few and always under the strict supervision of Humphrey. Elmore more closely resembles a occasional visitor "who is merely present with the consent of the householder . . . ." *Carter*, 525 U.S. at 90, 119 S.Ct. 469.

Elmore argues that, by allowing Elmore into her apartment and allowing him to store contraband in her closet, Humphrey has shown herself "willing to share [her] house and [her] privacy" with Elmore. *Fields*, 113 F.3d at 321 (quoting *Olson*, 495 U.S. at 99, 110 S.Ct. 1684.). However, the Supreme Court in *Olson* was referring to a radically different situation when discussing the type of privacy an individual in our society is entitled to expect. Justice White, in addressing the question of whether an overnight guest could maintain a reasonable expectation of privacy under the Fourth Amendment, expounded at length upon the American tradition of staying overnight at others' homes and hosting others in our homes. *See, e.g., Olson*, 495 U.S. at 98–100, 110 S.Ct. 1684. This tradition formed the basis of the defendant's subjective expectation of privacy, which was "rooted in 'understandings that are recognized and permitted by society . . . .'" *Id.* at 100, 110 S.Ct. 1684 (quoting *Rakas*, 439 U.S. at 144, 99 S.Ct. 421.).

Thus, "society is prepared to recognize [the defendant's expectation of privacy] as reasonable." *Id.* at 96–97, 110 S.Ct. 1684.

▮ Elmore's expectation of privacy is not one "that society is prepared to recognize as reasonable." *Id.* His relationship to Humphrey's apartment is based primarily on Humphrey's willingness to store contraband inside it for Elmore's benefit. While illegal activity does not doom a defendant's claim to a reasonable expectation of privacy, *see Fields*, 113 F.3d at 321, it, by itself, does not provide a basis with which to invoke the societal understandings and "privacy sharing" discussed in *Olson*.

Elmore's connection to the apartment is basically transient, and not one generally recognized as reasonable by society. Therefore, Elmore did not have a reasonable expectation of privacy with regards to Humphrey's apartment, and his Fourth Amendment rights were not violated by the search conducted by the Norwalk Police. *See Osorio*, 949 F.2d at 40.

### 2. *Elmore's Bags*

When the police entered Humphrey's apartment, they asked her where Elmore's firearms were located. Tr. Roncinske at 24. Humphrey responded that the firearms were located in her closet in a blue duffel bag. *Id.* Humphrey knew this information personally because, after Elmore gave her the bags, she examined them and saw the guns. *See* Def's Ex. 21 at 1 (Miranda Statement of Tanea Humphrey). Thus, a known eyewitness to an illegal act told the Norwalk Police, in person, where contraband was stored. This is sufficient for a finding of probable cause.

▮ However, the owner of a closed bag has a reasonable expectation of privacy in the bag, such that he has standing to challenge a search of that bag. *See Perea*, 986 F.2d at 641–42 (noting that the

holding in *McGrath*, 613 F.2d at 365–66 ruled that "only the [individual] who owned the briefcase had a protectable privacy interest in it."). This conclusion is correct even if the person does not have a reasonable expectation of privacy in the location the bag was seized. *See, e.g., United States v. Wilson*, 536 F.2d 883, 885 (9th Cir.1976) (defendant who left a suitcase in another's apartment, but did not spend much time or the night there, has standing to challenge the search and seizure of his own suitcase). In this case, the bags found during the search of Tanea Humphrey's apartment were closed and belonged to Elmore. Therefore, Elmore has a reasonable privacy interest in those bags and has a Fourth Amendment right to challenge the reasonableness of the search of those bags by the Norwalk Police. *See Perea*, 986 F.2d at 641–42; *see also McGrath*, 613 F.2d at 365–66; *Wilson*, 536 F.2d at 885.

▮▮▮▮ The Norwalk Police did not obtain a search warrant prior to searching or seizing the bags. While it is well established that a valid warrant to search a dwelling gives the police the right to search all areas and containers within the dwelling which could contain the item(s) listed in the warrant, *see United States v. Ross*, 456 U.S. 798, 820–22, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), the presence of a warrant does not strip the owner of a closed container within the dwelling of the right to challenge its validity. Of course, if the warrant is valid, the bag-owner's Fourth Amendment rights are satisfied, and the police may search the bag. *See id.* However, if the warrant is not valid, its fruits will be suppressed if the search did

not fall within one of several recognized exceptions to the exclusionary rule. *See United States v. George*, 975 F.2d 72, 77 (2d Cir.1992).

### C. *The Search Warrant*

The government does not dispute the fact that, if the court suppresses the evidence collected as a result of the *Terry* stop, and Elmore has standing to challenge the search warrant, the search warrant is invalid. *See* Government's Supplemental Memorandum in Opposition to Defendant's Motion to Suppress (February 1, 2005) at 19–20. As discussed in Sections II.A and II.B.2., *supra*, the court is suppressing the *Terry* stop information and has found that Elmore has a reasonable expectation of privacy in his bags. Therefore, the court agrees with the parties and finds that, absent the *Terry* stop evidence, the search warrant affidavit lacked probable cause, and the search warrant is invalid.[12]

However, despite the invalidity of the search warrant, the government argues that the court should not suppress the guns found in Elmore's bags because the police officers acted in good faith, believing they were executing a valid search warrant.

### D. *The Good Faith Exception*

Good faith is one of the well-delineated exceptions to the rule that the fruit of a search undertaken pursuant to an invalid warrant should be suppressed. *See United States v. Leon*, 468 U.S. 897, 913, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Leon*, the Supreme Court held that courts should not invoke the exclusionary rule and suppress evidence collected in the ab-

---

**12.** Indeed, without the evidence collected as a result of the *Terry* stop, the police had no more information to support a warrant than they had to support their original stop of Elmore's car. If that information was insuffi-

cient to support the "reasonable suspicion" necessary for a *Terry* stop, it necessarily is insufficient to meet the higher standard of probable cause.

sence of a valid warrant when "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id.* at 920, 104 S.Ct. 3405. The Court so concluded because the exclusionary rule's objective of deterring governmental violation of an individual's Fourth Amendment rights is not served where evidence is suppressed when "officers acted in the objective good faith belief that their conduct did not violate the Fourth Amendment." *Id.* at 918, 104 S.Ct. 3405.

> In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. "[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law."

*Id.* at 921, 104 S.Ct. 3405. "The test of objective good faith is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Moore*, 968 F.2d 216, 222 (1992) (quoting *Leon*, 468 U.S. at 922 n. 23, 104 S.Ct. 3405).

■ There are exceptions to *Leon's* good faith exception. The good faith exception does not apply: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Id.*

■ Elmore argues that the Norwalk Police cannot claim the good faith exception because Detective Roncinske intentionally omitted several pieces of information from his warrant application affidavit that made the affidavit misleading. *See*

Defendant's Supplemental Memorandum in Response to Government's Opposition of February 1, 2005 at 5 ("Def's Feb. 14 Memo.") Specifically, Elmore argues that the affidavit was misleading due to Roncinske's failure to state that he did not know Mazza prior to their first phone conversation, to detail exactly what he knew of Mazza, to state that he did not know when Mazza last saw a firearm or narcotics in Elmore's car, to state that the information concerning Elmore's shooting had not been proven in a court of law, to state that Mazza had refused to meet with police, or to alert the court that Mazza was Elmore's ex-girlfriend, and hence might have a motive to falsely incriminate him. *See* Def's Feb. 14 Mem. at 5. Elmore argues that without this information, Detective Roncinske's affidavit distorted the picture before the issuing judge and caused him to issue a warrant under circumstance where the judge might otherwise have refused. *See id.* at 5–6. Elmore also claims that a detective of Roncinske's experience should have known that the warrant application was defective on its face. *See id.* at 6.

[25] The exclusion of probative information from a search warrant affidavit does not necessarily negate either a finding of probable cause or the good faith of the affiant police officer. *See United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir.1993). In *Smith*, the search warrant affidavit for an apartment where a confidential informant had made two controlled purchases of narcotics failed to include the fact that the police had attempted two additional controlled purchases that had failed. *See id.* at 1011. The Second Circuit held that the affidavit contained sufficient information to find probable cause, *see id.* at 1013, and that the failure to include the probative, seemingly exculpatory, information did not negate an other-

wise sufficient application, *id.* at 1014. The police's failure to inform the magistrate of this information likewise did not keep the court from finding that the officers acted in good faith. *See, e.g., id.* at 1015–16.

The omissions cited by Elmore are not sufficient for a finding that the magistrate was "knowingly misled" by Detective Roncinske. While Detective Roncinske may not have included every minute piece of information as Elmore sets forth, he is not required to do so. The court's review of the warrant application leads it to conclude that, under the totality of the circumstances, the information omitted was unlikely to mislead the Superior Court judge by "paint[ing] a different picture" than was the case, and did not "portray a scenario where an apparently known and trusted informant gave Detective Roncinske 'immediately verifiable' information concerning Mr. Elmore's contemporaneous possession of a firearm in his car." *See* Def's Feb. 14 Mem. at 5. The court finds that, while insufficient for a finding of probable cause, the information contained in the warrant application was true and correct to the best of Detective Roncinske's knowledge, and he did not intentionally omit information.

The court also finds that a reasonably well trained officer, in this case Detective Roncinske, would not have known "that the search was illegal despite the magistrate's authorization." *Moore*, 968 F.2d at 222 (quotation omitted). Like the decision in *Alabama v. White*, the court's decision in this case on the issue of "reasonable suspicion" was a close call. Unlike *White*, the court suppressed evidence vital to Detective Roncinske's showing of probable cause in his search warrant application. Prior to this ruling, the warrant application did not lack indicia of probable cause, and the warrant that issued did not appear facially invalid. Elmore does not allege that Detective Roncinske and the Norwalk Police acted outside of the scope of the warrant. In such a case, Detective Roncinske was entitled to rely on a judge's opinion of the correct answer to a difficult legal problem. *See, e.g., Leon*, 468 U.S. at 922, 104 S.Ct. 3405. Therefore, the court finds that Detective Roncinske and the Norwalk Police officers involved in the search of Tanea Humphrey's apartment conducted the search in good faith reliance on a warrant obtained from a neutral magistrate and acted within the scope of that warrant. Elmore's motion to suppress the firearms found in Tanea Humphrey's apartment is denied.

## III. CONCLUSION

For the foregoing reasons, defendant's motion to suppress evidence [Dkt. No. 15] collected pursuant to the June 25, 2003 *Terry* stop is hereby **GRANTED**, while defendant's motion to suppress evidence collected during the June 27, 2003 search of Tanea Humphrey's apartment is hereby **DENIED.**

**SO ORDERED.**