UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT


August Term, 2006


(Argued:  February 1, 2007                          Decided:  March 29, 2007
                                                    Errata Filed: April 27, 2007)
Docket Nos.  05-1734-cr(L), 05-6477-cr(XAP)




- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

                    *Appellant-Cross-Appellee*,

          -v.-

VAMOND ELMORE,

                    *Defendant-Appellee-Cross-Appellant*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X




Before:  POOLER, RAGGI, *Circuit Judges*, and SAND, *District Judge*.

     Appeal from the judgment of the United States District Court for the District of Connecticut (Hall, *J.*) suppressing evidence seized from a car on a tip from an informant as fruit of an unreasonable seizure in violation of the Fourth Amendment.  The government argues that there was reasonable suspicion to stop the defendant.  We reverse and remand.  Defendant cross-appeals from the district court's denial of his motion to suppress evidence seized from an apartment because the police relied in good faith on a search warrant issued by a neutral magistrate.  The government argues that the district court erred by even reaching that question

---

     The Honorable Leonard B. Sand, United States District Judge for the Southern District of New York, sitting by designation.

because the defendant lacked Fourth Amendment "standing" to challenge the validity of the warrant. Because we find that, with the evidence seized from the car, the search warrant was supported by probable cause, we affirm without reaching the questions of good faith and standing.

> ROBERT M. SPECTOR, Assistant United States Attorney *for* Kevin J. O'Connor, United States Attorney (William J. Nardini, Assistant United States Attorney, *of counsel*) District of Connecticut, *for Appellant-Cross-Appellee*.
>
> THOMAS P. BELSKY, Assistant Federal Defender, *for* Thomas G. Dennis, Federal Defender, New Haven Connecticut, *for Defendant-Appellee-Cross-Appellant*.

SAND, *District Judge*:

The government appeals from the district court's (Hall, *J.*) ruling that a tip from an informant was insufficiently corroborated to provide reasonable suspicion to stop defendant Vamond Elmore's car. The government argues that the district court incorrectly categorized the informant as anonymous and therefore required too high a level of corroboration. Defendant cross-appeals from the district court's ruling that evidence found pursuant to a search warrant issued based on the fruits of the stop should not be excluded under the good faith exception to the warrant requirement. The government also contends that the district court erred in ruling that the defendant had Fourth Amendment "standing" to challenge the search warrant.

**Background**

I. *Facts*

2

On June 22, 2003, Detective Thomas Roncinske of the Norwalk Police Department received a telephone call from a woman claiming to be a close friend of the defendant Vamond Elmore. The caller identified herself as "Dorothy" and provided Roncinske with her home and cell phone numbers. She told Roncinske that Elmore was in possession of some weapons and expressed concern that he might "do harm to somebody." Roncinske had not previously used the caller as a confidential informant and had never spoken to her before. Roncinske spoke with the caller approximately four times throughout the course of the day, gradually obtaining more information from her about herself and the defendant. He was able to communicate with her several times by calling the cell phone number that she had given him.

During the course of these calls, the caller eventually told Roncinske that her full name was Dorothy Mazza and that she had been Elmore's girlfriend, but she had recently kicked him out of her house. Roncinske used a Department of Motor Vehicles (DMV) database to obtain an address and birthdate for a Dorothy Mazza, but he did not go to the address that he found.[1] In an attempt to verify her identity, Roncinske asked Mazza about an incident in 2002 in which Elmore had been shot. Mazza knew about the incident and described the specific injuries that Elmore had sustained. She said she was the one who nursed him back to health. She also said that Elmore had been shot in retaliation for having pistol-whipped a man named Demark Bond. This information matched police reports on Elmore's injuries and the police's theory on a possible motive for the shooting. Details about the shooting and Elmore's injuries had been

---

[1] The record does not reflect whether Roncinske quizzed Mazza on the information he was able to obtain from the DMV records.

3

reported in several local newspaper articles, but the police's theory about the motive was not public information.

Roncinske did not meet face-to-face with Mazza because she said she was afraid of what would happen to her if she was seen working with the police. Mazza also insisted that her name be left out of any police reports because she knew that the defendant had weapons and was afraid that he would retaliate against her. Roncinske did not go to the address he had obtained from the DMV, nor did he attempt to call Mazza on the home telephone number she had given him. There is no evidence that Roncinske checked whether the phone numbers she gave him were registered to Dorothy Mazza.

Mazza told Roncinske that she had seen Elmore in possession of several firearms at her residence as recently as June 19, 2003 (three days earlier) and that was why she kicked him out. These weapons included a .38 caliber Smith & Wesson revolver loaded with hollow point bullets, a .22 caliber pistol, a .38 caliber revolver, a "riot pump" shotgun, and an AK-47 assault rifle. She said that Elmore kept the Smith & Wesson in his car, which she described as a black two-door Acura with tinted windows and new Connecticut license plates that recently had been switched over from temporary plates. She said that she had seen the gun hidden under an altered piece of carpet on the passenger's side of Elmore's car.

Mazza said that Elmore told her that he now kept the rest of the weapons with a woman named Tanea and in the car of one Dwayne Sherman. She told Roncinske that Tanea lived in Building 14 at 133 Monterey Place, in the apartment directly upstairs from Dwayne Sherman and his wife, in an area of Norwalk, Connecticut known as Carlton Court. She said that Elmore

4

frequented the Carlton Court and Round Tree Motel areas of Norwalk. Mazza also told Roncinske that Dwayne Sherman's BMW was parked outside Building 14.

Roncinske took several steps to attempt to corroborate the information that he got from Mazza. He went to 133 Monterey Place and found a BMW registered to Dwayne Sherman parked in front of Building 13, which shares a parking lot with Building 14. He learned that Dwayne Sherman's wife, Denita Sherman, leased an apartment in Building 14 and that a Myra Humphrey leased the apartment above the Shermans.[2] Finally, Roncinske checked Elmore and Sherman's criminal histories and discovered that they had been arrested together for armed robbery.

Based on the information he obtained from Mazza and his independent investigation, Roncinske drafted a memo to all Norwalk police officers indicating that he had received information that Elmore was in possession of a handgun. The memo stated that Elmore drove a black, two-door 1992 Acura whose last known registration was temporary, but now had regular Connecticut plates and that he frequents the Carlton Court and Round Tree Motel areas. The memo also warned that the weapon may be hidden under the carpet on the passenger side. A photograph of Elmore was attached to the memo.

Sergeant Kenneth King received Roncinske's memo at the start of his late night shift on June 24, 2003. Sometime shortly after 11:30 p.m. on June 24, Sergeant King and Officer Mark Suda, driving in separate cars, saw a black two-door Acura with tinted windows driving in the vicinity of Carlton Court. The officers, who knew Elmore from prior encounters, identified him

---

[2] Myra Humphrey turned out to be Tanea Humphrey's mother. Tanea also lived in the apartment, but Roncinske was not aware of this prior to the stop in question.

5

as the driver by looking through the untinted front windshield of the car as it passed. The officers turned their cars around, followed Elmore's car and then pulled it over. They approached the car and asked the occupants, Elmore and a woman Suda identified as Tanea Humphrey, to step out of the car. King examined the passenger compartment and found a .38 caliber Smith & Wesson underneath the driver's seat. The police placed Elmore under arrest and then took Tanea Humphrey to her residence at 133 Monterey Place.

Following the arrest, Roncinske applied for a search warrant for Tanea Humphrey's apartment and Dwayne Sherman's car based on the information he had received from Mazza, his own investigation, and the results of the stop that led to Elmore's arrest. A search warrant issued and the Norwalk police went to Humphrey's apartment on June 27, 2003. Upon entering, they read Humphrey *Miranda* warnings and asked her where the weapons were located. She told them the weapons were in two bags in her bedroom closet, which Elmore had asked her to keep for him. The police retrieved and opened the bags which contained an AK-47 assault rifle with an accompanying loaded magazine, a .22 caliber pistol, a shotgun, and a box of 500 rounds of .22 caliber ammunition. The police also found a .38 caliber revolver, loose ammunition, and some crack cocaine in Dwayne Sherman's car, but none of that contraband was charged in this case.

Elmore had a limited connection with Humphrey's apartment. He and Humphrey had been friends for one to two years. He did not reside at her apartment, nor had he ever been an overnight guest or even stayed for dinner. He did not have unfettered access to the apartment and had only been there approximately seven to ten times, each time only for about five minutes. His main link to the apartment was that Humphrey allowed him to store his bags in her closet.

6

II. *The District Court's Decision*

Defendant was charged with two counts of being a felon in possession of firearms: Count One for the weapons found in Tanea Humphrey's apartment and Count Two for the weapon found in his car. Elmore moved to suppress the evidence in both counts, arguing that the police lacked sufficient, reliable information to form a reasonable suspicion to justify an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968), and without the evidence they obtained during the stop, the police lacked probable cause to support the search warrant for Tanea Humphrey's apartment.

The district court held that, because the police did not do enough to confirm Mazza's identity and therefore "Roncinske did not really know with whom he was speaking," she should be treated as an anonymous informant. *United States v. Elmore*, 359 F. Supp. 2d 105, 114 (D. Conn. 2005). Analyzing Mazza's tip under the Supreme Court's decisions on anonymous informants in *Alabama v. White*, 496 U.S. 325 (1990) and *Florida v. J.L.*, 529 U.S. 266 (2000), the district court found that the tip lacked the necessary indicia of reliability to establish reasonable suspicion because Roncinske was not able to corroborate sufficiently the information she gave. Specifically, the district court noted Roncinske's failure to corroborate, with any specificity, predictive information about the future actions of third parties. Roncinske was only able to corroborate easily obtained information.

The district court found, and the government does not contest, that without the evidence they obtained when they stopped Elmore's car, the police lacked probable cause to support the search warrant for Tanea Humphrey's apartment and therefore the warrant was invalid. The district court further held that although Elmore lacked a reasonable expectation of privacy in

7

Tanea Humphrey's apartment, he had Fourth Amendment "standing" to challenge the validity of the search warrant because he had a reasonable expectation of privacy in his closed bags within the apartment. But the court went on to find that the "good faith exception" to the exclusionary rule, set forth in *United States v. Leon*, 468 U.S. 897, 913-15 (1984), applied. Because the officers reasonably relied on the search warrant issued by a neutral magistrate, whom they had not knowingly misled, the evidence they found by searching Humprey's apartment should not be excluded.

The government took an interlocutory appeal from the decision on Count Two to suppress the evidence found in Elmore's car. The defendant pleaded guilty to Count One charging the weapons found in Humphrey's apartment, subject to this appeal from the district court's application of the good faith exception, and was sentenced to 92 months imprisonment. The government also challenges the district court's finding that Elmore had "standing" to challenge the warrant.

**Discussion**

I. *The* Terry *Stop*

    A. *Standard of Review and Law Governing* Terry *Stops*

On appeal from a ruling on a motion to suppress, we review the district court's ultimate determinations of reasonable suspicion or probable cause de novo, but of course review findings of fact for clear error. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

Under *Terry v. Ohio*, 392 U.S. 1 (1968), police may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot, and may frisk him

8

if they reasonably believe he is armed and dangerous. *United States v. Colon*, 250 F.3d 130, 134 (2d Cir. 2001). When a suspect is stopped in a car, the police may perform a limited search of the passenger compartment if they reasonably believe that he is dangerous and may gain immediate control of a weapon. *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983). A *Terry* stop represents an intermediate response allowing police to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest. *Adams v. Williams*, 407 U.S. 143, 145-46 (1972). Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or hunch." *White*, 496 U.S. at 329-30 (internal quotation marks omitted). Police "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion [on a citizen's liberty interest]." *Terry*, 392 U.S. at 21. Like probable cause, reasonable suspicion is determined based on the totality of the circumstances but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002).

B. *Forming Reasonable Suspicion from Informants' Tips*

Reasonable suspicion may be based upon information from a confidential informant so long as the tip bears sufficient "indicia of reliability." *Williams*, 407 U.S. at 147. As in the probable cause context, courts must assess whether an informant's tip establishes reasonable suspicion under the totality of the circumstances approach set forth in *Illinois v. Gates*, 462 U.S. 213 (1983), though obviously a lesser showing is required. *See White*, 496 U.S. at 328-29.

9

Although in *Gates* the Supreme Court abandoned the rigid two-pronged test of *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969), the informant's "basis of knowledge" and "veracity" (*i.e.*, how he knows and why we should believe him) remain highly relevant to a determination of either probable cause or reasonable suspicion. *See White*, 496 U.S. at 328-29.

When the informant's tip, standing alone, lacks sufficient indicia of reliability because it does not do enough to establish the informant's basis of knowledge and veracity, it may still support a finding of reasonable suspicion if sufficiently corroborated through independent police investigation. *Draper v. United States*, 358 U.S. 307 (1959), provides the classic example. In *Draper*, a known and previously accurate informant told the police that Draper would arrive in Denver on a train from Chicago on one of two days carrying heroin. *Id.* at 309. He would be wearing a light colored raincoat, brown slacks, and black shoes, and he habitually "walked real fast." *Id.* at 309 & n.2. The informant gave no indication of the basis for his information. On one of the appointed days, the police in Denver observed a man matching Draper's description and wearing the predicted clothes get off a train from Chicago and begin walking quickly; they arrested him. *Id.* at 309-10. The Supreme Court held that the police had probable cause to arrest Draper because they had corroborated "every other bit" of the informant's tip and therefore had reasonable grounds to believe that the remaining unverified bit—that Draper was carrying heroin—was true. *Id.* at 313.

Even a tip from a completely anonymous informant—though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable, *see White*, 496 U.S. at 329—can form the basis of reasonable suspicion or probable cause if it is

10

sufficiently corroborated. In *Spinelli*, the Supreme Court cited *Draper* for the proposition that if an informant provided sufficient details, including predictions about the future actions of third parties, and those details are independently corroborated, the police could infer that the informant had some sort of inside information as his basis of knowledge. 393 U.S. at 416-17. Justice White, in his concurrence, stressed that *Draper* should not stand for the proposition that because some of the informant's tip proved to be true that the police could infer that the final critical fact was also true. In Justice White's view, corroboration did little to bolster veracity. *Id.* at 426-27 (White, J., concurring). In *Gates*, however, the Court reinterpreted *Draper*, implicitly disavowing Justice White's limitation. Stressing the importance of predictive information, the Court held that corroboration of some of the information in the tip allows the police to reasonably infer that the remaining, unverified information is also true. *Gates*, 462 U.S. at 243-45. Under the totality of the circumstances approach mandated by *Gates*, even a completely anonymous tip could support a finding of probable cause with a sufficient degree of corroboration. The degree of corroboration required for a finding of reasonable suspicion is obviously less. *White*, 496 U.S. at 330-31.

The Supreme Court discussed reasonable suspicion based on tips by anonymous informants in two cases: *Alabama v. White*, 496 U.S. 325 (1990) and *Florida v. J.L.*, 529 U.S. 266 (2000). Theses cases represent two poles on the spectrum of the degree of corroboration needed and formed the framework for the district court's analysis. The district court in the instant case followed *J.L.*, in which the police received a completely anonymous tip that a young black man in a plaid shirt at a particular bus stop had a gun. 529 U.S. at 268. There the Supreme Court held that the anonymous tip, plus corroboration of the fact that a black man with a plaid

11

shirt was at the bus stop, did not constitute reasonable suspicion to stop and frisk the man. *Id.* at 271-72. In *White*, on the other hand, a completely anonymous informant told the police that the suspect would leave a particular apartment at a particular time and drive to a particular destination in a particular car carrying drugs. 496 U.S. at 327. The police observed that the suspect leave the apartment building, get in the car and drive in the direction of the destination before stopping her. *Id.* The Court called it a close case, but held that because the tip predicted with specificity the future movements of a third party, there was reasonable suspicion. *Id.* at 332. In this case the district court distinguished *White* because here the police did not corroborate any predictive information that might make an anonymous tip sufficiently reliable to support reasonable suspicion.

Where informants are known, however, a lesser degree of corroboration is required. *Compare Williams*, 407 U.S. at 146-47 (upholding a *Terry* stop based on an uncorroborated tip from a known and previously reliable informant), *with White*, 496 U.S. at 331-32 (holding that an anonymous tip justified a *Terry* stop because both innocent details and predictive information were corroborated). A known informant's reputation may be assessed and he may be held accountable if his allegations turn out to be fabricated. *J.L.*, 529 U.S. at 270. While a proven track record of providing reliable tips may serve to bolster an informant's veracity, past performance is not the only way to show veracity. *See United States v. Canfield*, 212 F.3d 713, 719-20 (2d Cir. 2000). The veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted. *See Caldarola v. Calabrese*, 298 F.3d 156, 165-66 (2d Cir. 2002); *United States v. Rollins*, 522 F.2d 160, 164 (2d Cir. 1975) (noting

12

the "peculiar likelihood of accuracy" of a citizen informant's report). Likewise, we have held that an informant is more reliable if he meets with the police face-to-face because he runs a greater risk that he will be held accountable if his information proves false. *United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991).

Under the totality of the circumstances approach to assessing probable cause and reasonable suspicion mandated by *Gates* and *White*, informants do not all fall into neat categories of *known* or *anonymous*. Instead, it is useful to think of known reliability and corroboration as a sliding scale. Where the informant is known from past practice to be reliable, as in *Williams*, no corroboration will be required to support reasonable suspicion. Where the informant is completely anonymous, as in *White*, a significant amount of corroboration will be required. However, when the informant is only partially known (i.e., her identity and reliability are not verified, but neither is she completely anonymous), a lesser degree of corroboration may be sufficient to establish reasonable suspicion. This approach is consistent with the totality of the circumstance inquiry mandated by *Gates* and *White*, as well as the Supreme Court's characterization of *Terry* as providing an "intermediate response" for investigating criminal activity. *Williams*, 407 U.S. at 145.

C. *Was Dorothy Mazza an Anonymous Informant?*

The question almost answers itself.

The district court considered the question of Mazza's anonymity as a threshold inquiry and, finding that "the facts place the caller most appropriately in the category of anonymous informant," *Elmore*, 359 F. Supp. 2d at 114, went on to analyze reasonable suspicion under the

13

*White/J.L.* framework. While Mazza was unwilling to meet face-to-face and the police did not definitively confirm her identity, neither was she completely anonymous like the informants in *White* and *J.L.*

The government points to several cases where other circuits have found reasonable suspicion based on tips from informants who gave their names or other identifying information, but where the police did not meet them face-to-face or otherwise confirm their identities. Despite the fact that their identities were not definitively confirmed, the Fourth, Ninth, and Tenth Circuits did not treat the informants as anonymous and did not require the extensive degree of corroboration needed to find reasonable suspicion under the *White/J.L.* framework.

For example, in *United States v. Terry-Crespo*, 356 F.3d 1170, 1172 (9th Cir. 2004), an informant called 911 saying he had just been threatened with a handgun by a suspect whom he described. The caller gave his name, but not his location or contact information because he said he was calling from someone else's cell phone. *Id.* at 1172. The Ninth Circuit found that there was reasonable suspicion to stop and frisk the suspect because the caller was no longer anonymous once he had given his name, even though it was unconfirmed. *Id.* at 1174-75. The court also held that emergency calls should be treated as inherently more reliable than anonymous tips concerning general criminality. *Id.* at 1176.

In *United States v. Quarles*, 330 F.3d 650, 652 (4th Cir. 2003), a 911 caller said that a man walking down a particular street had a gun in his bag. The caller gave his name and location and said that the suspect had killed his brother and there was a warrant out for his arrest. *Id.* He stayed on the phone until the police made the stop. *Id.* The Fourth Circuit held that even though the police did not confirm the caller's identity or corroborate his assertion about the

14

warrant until after the stop, there was reasonable suspicion because the caller gave enough information to be identified later. *Id.* at 655.

In *United States v. Harris*, 313 F.3d 1228, 1231 (10th Cir. 2002), a Dairy Queen employee called the sheriff's office, gave her name, and said that two men were smoking marijuana in the parking lot. She called back a few minutes later to say that they were leaving and heading towards a car wash. *Id.* The police made no attempt to confirm her identity. The Tenth Circuit stated that the call was not anonymous and therefore could provide reasonable suspicion for a *Terry* stop, even absent any significant corroboration.[3] *Id.* at 1235-36.

Finally, in *United States v. Browning*, 252 F.3d 1153, 1155-56 (10th Cir. 2001), a woman called 911 and said that she had just been assaulted in a car. She described the car and her assailant and gave his name. *Id.* at 1156. She also gave her name and the location and phone number of the payphone from which she was calling. *Id.* The dispatcher called the payphone several times to get more information including the caller's date of birth, but the police made no attempt to verify her identity or corroborate any of the information she gave. *Id.* The Tenth Circuit found that there was reasonable suspicion for the police to pull over a car matching the description the caller gave. *Id.* at 1157.

Like the informants in these cases, Mazza gave the police enough information about herself to allow them to identify her and track her down later to hold her accountable if her tip proved false. She gave them her name, her relationship with the defendant, and two phone numbers at which she could be contacted. Defendant argues that *Terry-Crespo*, *Quarles*, *Harris*,

---

[3] An alternative basis for this holding was that upon approaching the defendants before a stop took place, the officer smelled burnt marijuana. *Harris*, 313 F.3d at 1236.

15

and *Browning* are distinguishable because other factors, such as whether the call was made contemporaneously with the criminal activity or whether the call was an emergency 911 call, established reliability that is not present here. Yet Detective Roncinske went far beyond what the police did in those cases in his attempt to confirm Mazza's identity. He confirmed from DMV records that the name she gave belonged to a real person and learned her address and date of birth. He confirmed that he could reach her at one of the phone numbers she gave him and that she was willing to speak with him several times. He confirmed that she knew where Elmore was wounded and the motive for the shooting. Although the injuries were reported, the motive matched the police's theory, which was not publicly known. While she was unwilling to meet with Roncinske face-to-face, she had a good reason for her reluctance—she was afraid the defendant would retaliate against her.

It is unquestionable that Roncinske could have done more to confirm Mazza's identity. He could have quizzed her on her address or date of birth. He could have checked telephone records to see if the numbers she gave him were registered to Dorothy Mazza. He could have called the home telephone number that she gave him.[4] These things he did not do. It is *possible* that someone could have pretended to be Dorothy Mazza and made the call, but that person would have had to do a fair amount of research and would expose herself to a real chance of being caught and punished. Reasonable suspicion is a question of probabilities, not possibilities. We have no trouble concluding that the district court erred by placing Mazza in the same category as the completely anonymous informants in *J.L.* and *White*.

[4] The district court noted that Roncinske only contacted Mazza on the cell phone number she gave him and that "such calls could be answered by anyone, anywhere in the United States that had cell phone service." *Elmore*, 359 F. Supp. 2d at 114 n.7 Presumably, by calling her home phone number, Roncinske could have at least associated her with a specific location.

16

D.  *Analysis Under the Totality of the Circumstances*

Having determined that the district court erred by categorically treating Mazza as an anonymous informant because the police did not definitively confirm her identity, we now analyze whether the police had reasonable suspicion to stop the defendant under the totality of the circumstances.

We note first that Mazza's basis of knowledge is well established.  She told Roncinske that she knew that Elmore kept the Smith & Wesson revolver in his car because she had personally seen it there.  She knew that he possessed the rest of the weapons because she had seen them at her residence and he told her where he subsequently kept them.  Her status as an insider who would have access to that type of information is not in question.  She told Roncinske that she had been Elmore's girlfriend and that he had lived with her.  This is not a case like *Draper* or *Spinelli* where the police needed to infer that the informant was an insider from the detail and predictive information in the tip.  Mazza told Roncinske exactly how she knew about Elmore's criminal activities.

The only thing at issue is Mazza's veracity—that is, whether she was telling the truth.  Because the informant was not completely anonymous (though her identity was not confirmed to a certainty), we find it inappropriate to require the same level of corroboration that the Supreme Court required in *White* and *J.L.*  Mazza was a citizen informant whose veracity is generally presumed.  Her veracity is further bolstered because she gave the police enough information

17

about her identity (which was corroborated to some degree) that she should have reasonably believed that the police could track her down and hold her accountable if her tip turned out to be a malicious falsehood.

Although they were not able to corroborate the sort of predictive information that the Supreme Court found compelling in *White*, the police did corroborate a significant portion of the information in Mazza's tip. Roncinske confirmed that the Dwayne Sherman lived in Building 14 at 133 Monterey Place and that his car was parked outside. He also confirmed that Elmore and Sherman had been accomplices in a previous criminal endeavor. Sergeant King and Officer Suda confirmed that Elmore drove the black Acura that Mazza described in the area of Norwalk that she said he frequents.

A tip from a citizen informant whose identity is disclosed (though not confirmed to a certainty) that is corroborated to a significant degree can support a finding of reasonable suspicion. We hold that, under the totality of the circumstances, Mazza's tip plus the corroboration from the police investigation were enough to give the police reasonable suspicion to stop Elmore. The evidence in Count Two should not have been suppressed.

II. *The Search Warrant*

Defendant challenges the district court's decision on Count One not to suppress evidence found in Tanea Humphrey's apartment because the police relied in good faith on a warrant issued by a neutral magistrate. The government argues that the district court erred in even reaching this question because Elmore lacked Fourth Amendment "standing" to challenge the

18

search warrant because he had no reasonable expectation of privacy in Humphrey's apartment or the bags he stored there.

Because we find that the *Terry* stop was supported by reasonable suspicion, the evidence seized from Elmore's car would not be excluded in considering whether the search warrant was supported by probable cause. We find that Mazza's tip, corroborated by the weapon found in Elmore's car and other police investigation, gives rise to probable cause to support the search warrant. *See, e.g.*, *Gates*, 462 U.S. at 243-44. Therefore we need not reach the questions of whether the defendant had a reasonable expectation of privacy in the premises or containers searched and whether the search fell under the good faith exception to the warrant requirement.

**Conclusion**

The portion of the district court's order suppressing evidence found in Elmore's car is reversed. Count Two is remanded for further proceedings consistent with this opinion. The portion of the district court's order on Count One denying the motion to suppress evidence found in Tanea Humphrey's apartment is affirmed because we find that the search warrant was supported by probable cause.

19