UNITED STATES of America

v.

Dean A. STEPPELLO, Defendant.

No. 5:09–CR–318–DNH.

United States District Court,
N.D. New York.

Aug. 20, 2010.

United States Attorney—Syracuse Office, Richard Southwick, Esq., Tamara Thomson, Esq., Geoffrey J.L. Brown, Esq., of counsel, Syracuse, NY, for the United States of America.

Office of Lee D. Greenstein, Lee D. Greenstein, Esq., of counsel, Delmar, NY, for Defendant.

## MEMORANDUM–DECISION & ORDER

DAVID N. HURD, District Judge.

### I. INTRODUCTION

Defendant Dean Steppello ("defendant") is charged with two counts of knowingly and intentionally possessing with the intent to distribute a mixture and substance containing a detectable amount of cocaine in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1). Defendant has filed three separate, but related, motions to suppress the following evidence: (1) evidence seized from his person during his arrest; (2) statements made during and following his arrest; and (3) evidence seized during the execution of a search warrant for his home. The United States of America (the "Government") opposes defendant's motions.

A suppression hearing was held on June 7, 2010, in Utica, New York. At defendant's request, the parties were afforded time to review a transcript of the proceedings and submit their proposed findings of fact and law. Those submissions have been received and reviewed together with the transcript.

### II. FINDINGS OF FACT

On June 25, 2008, the Community Narcotics Enforcement Team ("CNET") for the New York State Police executed a

search warrant for the residence of Richard Szuba in Utica, New York. During the search, Szuba admitted he was in possession of approximately 2.5 ounces of cocaine and identified the defendant as his supplier. Szuba then agreed to cooperate with the police by providing a description of defendant's vehicle and making a visual identification of defendant's residence at 1607 Guelich Street in Utica, New York. He later placed a phone call to defendant at the direction of Investigator Eric Jones. Although the phone call was not recorded, Investigator Jones and other CNET members observed Szuba say the following words during the approximately eight-second phone call: "You good? This afternoon? Twenty minutes?" After ending the phone call, Szuba stated to CNET that he believed defendant would arrive shortly to deliver cocaine.

Approximately fifteen minutes after the phone call, Investigator Matthew Sullivan observed a vehicle matching Szuba's description arrive at 1607 Guelich Street. He then saw what he described as a "white male" exit the vehicle, enter the residence, and return to the same vehicle five minutes afterwards. Suppression Hr'g. Tr., 129:2–21. After observing the white male drive away from the residence, Investigator Sullivan followed and notified other members of CNET that the vehicle was heading towards Szuba's home. Due to the fear that he would be recognized while driving, Investigator Sullivan stopped following the vehicle after it turned onto the same street as Szuba's residence.

Moments later, Investigator Jones observed a vehicle matching the description enter Szuba's driveway. At that time, Szuba was located in his living room and could not observe either the vehicle or the driver. The driver remained in his vehicle for several minutes before exiting to approach Szuba's garage door. As he approached, Investigator Jones and several other CNET members emerged from a side entrance to the garage and arrested the driver. Upon arrest, the driver was identified as the defendant, and a search of his person revealed a bag of white powder which the Government alleges field tested positive for 111.5 grams of cocaine. While in custody, defendant allegedly stated without being interrogated that he was at Szuba's residence to meet with "someone," and that if given the opportunity, he would make a phone call to help investigate someone "bigger." Shortly after defendant was taken into custody, Investigator Sullivan arrived at Szuba's residence after traversing through a neighboring yard as part of his efforts to avoid detection during his surveillance of defendant's vehicle. Defendant was then read his *Miranda* warnings and invoked his right to counsel. He later stated without being interrogated that he wanted the District Attorney and his own attorney present before he "gave up" his supplier in exchange for "some type of consideration."

Following the arrest, the police applied to Utica City Court Judge John Balzano for a search warrant for defendant's home. In support of a finding of probable cause, the warrant application stated that (1) Szuba requested cocaine from the defendant over the phone; (2) defendant was observed traveling from his home to Szuba's residence "to complete the delivery of cocaine;" (3) cocaine was found on defendant's person after he was arrested; and (4) Szuba had stated to CNET that defendant had provided him with cocaine on previous occasions. Ex. D to Def.'s First Mot. for Omnibus Relief, Dkt. No. 7–4, 5. Under these alleged facts, Judge Balzano approved the warrant application.

During the execution of the search warrant for defendant's home, police seized six jars containing white powder, a digital

scale with white powder residue, $4,000 in U.S. currency, one rifle, and one shotgun. The powder in two of the jars was analyzed and tested positive for cocaine.

## III. FINDINGS OF LAW

### A. Motion to Suppress Evidence Seized During Defendant's Arrest

■ It is undisputed that defendant was subjected to a warrantless search of his person incident to his arrest on June 25, 2008. It is also well settled, and the Government does not argue otherwise, that defendant had a reasonable expectation of privacy in his person. Accordingly, the burden is on the Government to show that the search of defendant fell within one of the exceptions to the Fourth Amendment's warrant requirement, see *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir.1999) (citations omitted); namely, in this case, the search incident to arrest exception.

■ In order for the search incident to arrest exception to apply, the arrest must be lawful. See *United States v. Robinson*, 414 U.S. 218, 224, 94 S.Ct. 467, 471, 38 L.Ed.2d 427 (1973) ("[A] search may be made of the person of the arrestee by virtue of the lawful arrest."). A warrantless arrest will be considered unlawful if it is not supported by probable cause. See *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir.2008) (citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)). " 'Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested.' " *Valentine*, 539 F.3d at 93 (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir.1990)). Although only a substantial probability of criminal activity is required,

a law enforcement official's mere suspicion of criminal activity is insufficient to justify a warrantless arrest. *Valentine*, 539 F.3d at 93 (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983)).

■ The two-pronged test developed in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) no longer applies in cases where, as here, the Government relies heavily upon an informant's statements to support the legality of a warrantless arrest. *Alabama v. White*, 496 U.S. 325, 328, 110 S.Ct. 2412, 2415, 110 L.Ed.2d 301 (1990) (citing *Gates*, 462 U.S. at 230, 103 S.Ct. at 2328). Instead, whether an informant's information is sufficient to establish probable cause must be determined under the totality of the circumstances. *White*, 496 U.S. at 328, 110 S.Ct. at 2415 (citing *Gates*, 462 U.S. at 230, 103 S.Ct. at 2328). Nevertheless, "those factors that had been considered critical under *Aguilar* and *Spinelli*—an informant's 'veracity,' 'reliability,' and 'basis of knowledge'—remain 'highly relevant in determining the value of his report.' " *White*, 496 U.S. at 328, 110 S.Ct. at 2415 (quoting *Gates*, 462 U.S. at 230, 103 S.Ct. at 2328).

■ The level of corroboration needed to establish an informant's veracity operates on a sliding scale with the informant's track record of reliability and whether his identity is known to law enforcement. *United States v. Elmore*, 482 F.3d 172, 181 (2d Cir.2007). If known from prior dealings with law enforcement to have provided reliable information, an informant will generally be presumed reliable without much, if any, corroboration of his information. *Id.* On the other hand, if an informant is completely anonymous and has no track record of reliability, law enforcement

will have to substantially corroborate his information in order to establish probable cause. *Id.* With respect to informants who fall somewhere in the middle of this spectrum, e.g., an informant whose identity is known but has no track record of providing reliable information to law enforcement, more corroboration is needed than for an informant with a reputation for being reliable, but less corroboration is required than for a completely anonymous informant with no record of reliability. *See id.*[1]

Under the totality of the circumstances before defendant was arrested, there was no probable cause to believe he had either committed or was about to commit a crime as he approached Szuba's driveway. At the time of his arrest, the police had nothing more than the partially corroborated account of a criminal informant with no history of reliability. Admittedly, CNET was able to corroborate several pieces of information Szuba provided, including a general description of defendant's vehicle and an eyewitness identification of defendant's residence. However, there was no independent corroboration of his allegation of defendant's drug dealing. The phone call observed by police offers little, if any, indicia of probable cause due to its brevity, the inability to hear what defendant said, and the lack of any reference to a drug sale. Additionally, Investigator Jones testified that the phone call was placed "to see if Mr. Steppello was going to be in the area, not to deliver cocaine...." Suppression Hr'g. Tr., 29:26–30:2. Particularly damaging to the Government's argument

is that Investigator Sullivan never identified the "white male" he saw enter 1607 Guelich Street as the defendant. *See id.* at 129:2–130:9. He never testified that he had personal knowledge of defendant's physical appearance prior to that day, or at a minimum, that Szuba or any members of CNET provided him with a description of defendant. There was no testimony that the license plates of the vehicle he observed at the Guelich Street residence matched the license plates of the vehicle registered to defendant. Instead, Investigator Sullivan assumed the white male who entered the Guelich Street residence was defendant because a vehicle matching Szuba's general description of "a silver colored SUV-type truck," *id.* at 213:24–26, arrived shortly after the brief, ambiguous phone call placed by Szuba. Rather than make a pre-arrest identification of defendant as the same person he saw enter 1607 Guelich Street, Investigator Sullivan did not confirm defendant's identity until after Investigator Jones made the arrest. *Id.* at 131:9–22. Similarly, Szuba was unable to visually identify defendant prior to the arrest because police had detained him in his living room with no view of his driveway. *Id.* at 204:6–205:26.

Had the police observed defendant enter Szuba's home and make an offer to sell cocaine, they would obviously have had probable cause to make an arrest. However, that is far from what happened here; rather, they observed nothing more than a white male travel towards Szuba's home following an ambiguous phone call.

---

1. The *Elmore* Court considered the level of corroboration needed for a known informant's information to establish reasonable suspicion. Nevertheless, the sliding scale described in *Elmore* applies with equal force to determinations of probable cause while keeping in mind the higher probability of criminal activity needed to establish probable cause in comparison to reasonable suspicion. *See El-*

*more,* 482 F.3d at 180 ("Under the totality of the circumstances approach mandated by *Gates,* even a completely anonymous tip could support a finding of probable cause with a sufficient degree of corroboration. The degree of corroboration required for a finding of reasonable suspicion is obviously less.") (citing *White,* 496 U.S. at 330–31, 110 S.Ct. at 2416).

Investigator Jones never testified as to how he knew the man approaching Szuba's garage was the defendant, and neither Investigator Sullivan nor Szuba were given the opportunity to identify the "white male" prior to the arrest. Despite recognizing defendant's name because of a prior narcotics investigation spanning from late 2001 to early 2002, *see id.* at 27:16–19, Investigator Jones never stated that he had knowledge of defendant's physical appearance before he observed him outside Szuba's garage door, and he admitted during his testimony that he was not personally involved in the prior drug investigation. *Id.* at 28:2–5. There was no testimony that any members of CNET questioned defendant as to his identity or purpose for being at Szuba's residence prior to the arrest. To the contrary, defendant was immediately seized and searched after Investigator Jones and his team emerged from the side entrance to Szuba's garage.

There was also no evidence that defendant engaged in any particularly suspicious or furtive behavior after arriving at Szuba's residence. The Government's witnesses conceded that they never observed defendant carrying a package or walking with a bulge in any of his pockets. To the extent the Government contends that defendant acted suspiciously by placing several phone calls to Szuba while sitting in Szuba's driveway, there are serious doubts as to whether such phone calls were ever made. First, Szuba directly contradicted the testimony of Investigator Jones by stating that he never received any phone calls from defendant that day. *Id.* at 205:20–26; 217:20–218:2. Second, Investigator Jones testified as to the alleged phone calls during his direct examination, but he then conceded during cross-examination that: (1) he never testified about the phone calls during either of his two prior appearances in state court, including a grand jury proceeding related to the same investigation; (2) he completely omitted the phone calls from his search application to Judge Balzano; and (3) there is no mention of the phone calls in any of his notes that were compiled during and shortly after the investigation was completed. *Id.* at 83:3–87:15. Third, the Government's allegation that the phone calls were made is belied by the lack of any evidence of defendant's or Szuba's cellular phone records for the day of the arrest. In any event, even if the alleged phone calls placed from Szuba's driveway occurred, that conduct did little to add to the probability that defendant was about to engage in criminal activity.

Prior to defendant's arrest, CNET was only able to corroborate Szuba's description of defendant's vehicle, his knowledge of where defendant lived, and his request over the phone that defendant come to his home. Although Szuba was, to some degree, predictive of defendant's future actions, there was no evidence admitted at the suppression hearing indicating how CNET knew that the "white male" was in fact the defendant. When combined with defendant's complete lack of suspicious behavior prior to his arrest, this evidentiary deficiency is fatal to the Government's showing of probable cause because it diminishes the significance of the limited information Szuba provided that CNET was able to corroborate. At the time of the arrest, it remained that CNET had no reason to believe defendant intended to deliver cocaine but for the uncorroborated account of a criminal informant with no track record of providing reliable information. Therefore, under the totality of the circumstances, defendant's arrest was unlawful as it was unsupported by probable cause, and his motion to suppress the evidence seized during his arrest will be granted.

### B. *Motion to Suppress Statements Made During and After Defendant's Arrest*

█ Because the arrest was unlawful, the statements defendant allegedly made will also be inadmissible. *See Brown v. Illinois*, 422 U.S. 590, 601–05, 95 S.Ct. 2254, 2260–62, 45 L.Ed.2d 416 (1975). As a preliminary matter, there is serious doubt whether defendant ever made the statements identified by the Government. Approximately eighteen months transpired between defendant's arrest and the first time law enforcement officers indicated that defendant made the alleged statements. There is no record in the officers' notes that the alleged statements were made, the statements were not included in the search application made to Judge Balzano, and there was no testimony at the grand jury proceedings as to the statements.

In any event, the circumstances surrounding defendant's alleged statements require suppression in light of the illegality of his arrest. In particular, defendant's first alleged statement, "I can do somebody," was made as CNET members took him to the ground outside Szuba's garage. Suppression Hr'g Tr., 39:25–40:3. His second alleged statement—that he wanted to speak to the District Attorney before identifying his supplier—was made just moments later inside Szuba's garage after he had been handcuffed. *Id.* at 40:6–41:2. The fact that the second alleged statement was made after Investigator Jones issued defendant *Miranda* warnings is irrelevant in light of the Supreme Court's holding in *Brown v. Illinois. See Brown*, 422 U.S. at 601–02, 95 S.Ct. at 2261–62 ("[E]ven if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains … Wong Sun thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment.") Given the lack of intervening circumstances and the strong temporal proximity between defendant's arrest and the two alleged statements, the violation of defendant's Fourth Amendment rights by virtue of his illegal arrest taints the admissibility of his statements. *See id.* at 603–04, 95 S.Ct. at 2261–62 (citing *Wong Sun v. United States*, 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963)).

█ The lack of questioning on behalf of the police is not always irrelevant. In some cases, a statement will not be suppressed as fruit of an illegal arrest if the statement was "'an act of free will sufficient to purge the primary taint of the unlawful invasion.'" *Kaupp v. Texas*, 538 U.S. 626, 632–633, 123 S.Ct. 1843, 1847, 155 L.Ed.2d 814 (2003) (alteration marks omitted) (quoting *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416–17). Although the Government was afforded two separate opportunities to address the spontaneity of defendant's alleged statements, *see* Government's Resp. in Opp'n to Def.'s Mot. to Suppress Statements, Dkt. No. 19; Government's Post–Suppression Hr'g. Mem. of Law, Dkt. No. 54, the Government declined to offer any argument as to this issue. The failure to raise an argument as to the admissibility of the alleged statements is particularly deficient as the Government bears the burden of persuasion. *See Kaupp*, 538 U.S. at 633, 123 S.Ct. at 1847 (citing *Brown*, 422 U.S. at 604, 95 S.Ct. at 2262). Regardless, the temporal proximity of defendant's alleged statements to when he was taken down to the ground and handcuffed render it unreasonable to infer that his statements were sufficient acts of his own free will to remove the taint of the unlawful arrest. *See Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416–417. Therefore, defendant's motion to suppress the alleged statements will be granted.

## C. *Motion to Suppress Evidence Seized From Defendant's Home*

 The Government relied heavily upon the cocaine seized incident to defendant's arrest in its search application to Judge Balzano. *See* Ex. D to Def.'s First Mot. for Omnibus Relief, Dkt. No. 7–4, 5. However, because the police lacked probable cause to make the arrest, the evidence seized from defendant incident to his arrest must be struck from the warrant application when considering the legality of the search of defendant's home. *United States v. Trzaska,* 111 F.3d 1019, 1026 (2d Cir.1997) (quoting *United States v. Reilly,* 76 F.3d 1271, 1282 n. 2 (2d Cir.1996)).

Absent the cocaine found on defendant's person, there would have been insufficient indicia of probable cause to issue the warrant. The police could not corroborate Szuba's allegations of defendant's drug dealing from the Guelich Street residence and had not observed defendant engage in any criminal activity. Moreover, a records check did not reveal that defendant lived in the Guelich Street residence. In essence, the legality of defendant's arrest was the lynchpin for the admissibility of the evidence seized from his home because there was no probable cause to search his home but for the cocaine found on his person and the inculpatory statements he made during the course of the arrest.

 Notwithstanding the lack of probable cause, the exclusionary rule will not apply in cases where it was objectively reasonable for officers to rely on a search warrant that is subsequently invalidated. *See United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984). This good faith exception to the exclusionary rule will generally allow the admissibility of evidence seized pursuant to an improperly issued search warrant unless: (1) the issuing magistrate "was misled by information in an affidavit that the affiant either knew was false or would have known was false but for his reckless disregard for the truth;" (2) "the issuing magistrate wholly abandoned his judicial role;" (3) the affidavit supporting the warrant application was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or (4) the warrant application was so facially deficient that reasonable officers executing the warrant cannot believe it to be valid. *Id.* at 923, 104 S.Ct. at 3421 (citations omitted).

The merits of the good faith exception are obvious: "[w]here good faith exists, courts may [ ] correct erring magistrates and provide them with guidance without incurring the social cost of letting the guilty profit from decisions that define the boundaries of the Fourth Amendment." *Reilly,* 76 F.3d at 1273. Nevertheless, "[g]ood faith is not a magic lamp for police officers to rub whenever they find themselves in trouble." *Id.* at 1280. The record must demonstrate that law enforcement personnel had a "sincerely and objectively reasonable belief that the warrant [was] based on a valid application of the law to *all the known facts* ... And perhaps most important, [the good faith exception] is not an excuse if the police are not frank with the magistrate in proceedings to obtain the warrant-proceedings that are typically ex parte." *Id.* at 1273 (emphasis added) (citing *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978)).

As is the case here, the police in *Reilly* argued that the good faith exception applied to evidence found during the execution of a subsequently invalidated search warrant. *See* 76 F.3d at 1280. In that case, the Second Circuit held that police misled the issuing magistrate by failing to adequately describe their conduct during the collection of information which was

later used to support their search warrant application. *Id.* Due to the material omissions from the warrant application, the court determined that the issuing magistrate was deprived of the ability to evaluate whether the information in the application "was itself the fruit of an illegal search that lacked the elements of good faith." *Id.* The court also held that the officers' conduct before making their application as well as their omissions within the application raised serious doubts about their good faith at the time they relied upon the search warrant. *Id.* Although the *Reilly* court cautioned that it was not creating a rule of law whereby the fruit of illegal searches can never be the basis for a search warrant that the police rely upon in good faith, *id.* at 1280–81, it nevertheless concluded that the officers' recklessness for the truth and obvious violation of the defendant's constitutional right justified the application of the exclusionary rule to the illegally obtained evidence:

> The facts surrounding that prior search, moreover, raise serious doubts about the officers' good faith at that earlier time. The officers went to Judge Barrett with the fruit of this prior search in hand, and it was on the basis of that evidence that they asked him to issue a warrant. *Yet the officers never gave Judge Barrett a full account of what they did.* And without such an account, Judge Barrett could not possibly decide whether their conduct was sufficiently illegal and in bad faith as to preclude a valid warrant. This fact, by itself, makes Leon inapplicable.

*Id.* at 1280. (emphasis added).

Much like the officers in *Reilly*, Investigator Jones omitted from his warrant application any information related to the circumstances under which defendant was arrested and subsequently searched. With respect to the arrest itself, the application merely read, "Steppello was taken into custody by this affiant and was found to be in possession of cocaine." Ex. D to Def.'s First Mot. for Omnibus Relief, Dkt. No. 7–4, 5. Investigator Jones never informed the magistrate that the arrest was made prior to defendant entering Szuba's home. In fact, the application altogether omits any description of where defendant was arrested. The application also stated that Szuba requested defendant deliver cocaine to his residence during a controlled phone call. However, the Government concedes that the phone call was not recorded and that none of the officers heard either the defendant or Szuba mention any delivery of cocaine or parlance commonly used to describe illicit drugs. Because these facts were altogether omitted from the warrant application, the issuing magistrate was led to believe that the police heard Szuba request that defendant deliver cocaine, whereas in reality, the officers had no way to know what defendant said during what was an ambiguous and extremely brief phone call. This omission bears particular significance because, prior to the arrest, CNET had only corroborated that Szuba accurately stated defendant's address and a general description of what was believed to be his vehicle. Nevertheless, the warrant application stated that defendant was observed driving to Szuba's residence "to complete the delivery of cocaine," but nothing in the application informed the issuing magistrate that this information was based upon the uncorroborated account of an informant with no track record of reliability. The warrant application also led the issuing magistrate to believe that Investigator Sullivan knew definitively that it was the defendant who left the Guelich Street residence before arriving at Szuba's home, yet, as already discussed, Investigator Sullivan only testified that he observed a "white male" enter and exit the residence, and in any event,

Investigator Sullivan was not present at Szuba's home to identify defendant before the arrest was made. Although the application included a physical description of defendant, it also ambiguously avoided stating that Szuba provided this description or that any CNET members were aware of defendant's physical description prior to the arrest.

Much of the information omitted from the search warrant application was crucial for Judge Balzano to accurately evaluate the legality of the search incident to arrest because it misconstrued the basis of CNET's information and altogether passed over the circumstances under which defendant was arrested. An affiant's reckless disregard for the truth "may be inferred when omitted information was 'clearly critical' to assessing the legality of a search." *Reilly*, 76 F.3d at 1280 (quoting *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991)). The holding in *Reilly* supports the determination that the police in this case did not rely upon the search warrant in good faith. Much to the contrary, the information in the search warrant application, or lack thereof, played a direct role in preventing the issuing magistrate from properly considering the legality of the CNET members' conduct and whether the information in the application was the fruit of an illegal arrest. Accordingly, defendant's motion to suppress the evidence found in his home will also be granted.

## IV. *CONCLUSION*

All of defendant's motions are interrelated to the extent that the inadmissibility of his alleged statements and the evidence seized from 1607 Guelich Street flows from the illegality of his arrest. Although the circumstances outside Szuba's home on June 25, 2008 were likely enough to raise suspicion that criminal activity was afoot, there was insufficient corroboration of Szu-ba's information to demonstrate a substantial probability that a drug sale was about to occur. In particular, neither Investigator Sullivan nor Szuba were able to identify the defendant before he was arrested. Because defendant's arrest was illegal, his statements made virtually at the same time as his arrest must be excluded as tainted fruit of a Fourth Amendment violation.

Further, without the cocaine seized from defendant's person, there was no basis to search the residence at 1607 Guelich Street because of the relatively small amount of information from Szuba that CNET was able to corroborate. Finally, the material omissions in the search warrant application misled the issuing magistrate and demonstrated a reckless disregard for the truth. As in *Reilly*, the good faith exception to the exclusionary rule does not apply here because law enforcement personnel asked Judge Balzano to issue a search warrant based upon, in large part, the fruit of their illegal search and without providing a full and accurate account of defendant's arrest. Having been anything but frank with the issuing magistrate, the objective of the exclusionary rule is best achieved by suppressing the evidence found in defendant's home.

Accordingly,

it is ORDERED that

(1) Defendant's motion to suppress evidence seized from his person incident to his arrest is GRANTED;

(2) Defendant's motion to suppress alleged statements made during and after his arrest is GRANTED; and

(3) Defendant's motion to suppress evidence seized from 1607 Guelich Street in Utica, New York is GRANTED.